**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| SHAPIRO HOSPITALITIES LLC<br>d/b/a GRAND & CO.,<br><br>on behalf of itself and all others<br>similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>COSTAR GROUP, INC., and COSTAR<br>REALTY INFORMATION, INC.,<br><br>*Defendants.* | Case No. 1:26-cv-1027<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shapiro Hospitalities d/b/a Grand & Co., on behalf of itself and all others similarly situated, by and through its undersigned counsel, brings the following class action complaint against Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. for violations of the federal antitrust laws. The allegations set forth below are based on public information, non-public information, and information and belief.

## I.    INTRODUCTION

1.    This is a rare case about a company that has perpetrated an anticompetitive scheme so pernicious that its own customers openly lament how it has destroyed competition, leaving them no choice but to pay its supracompetitive prices.

2.    Defendants CoStar Group, Inc. and CoStar Realty Information, Inc (collectively, "CoStar") are the dominant provider of Internet Commercial Real Estate ("CRE") listing and information services—online platforms used by brokers and other CRE industry players to advertise, search, price, and evaluate CRE properties for sale and lease throughout the United

States. CoStar's listing and information services platforms yield approximately $2 billion in annual revenue for the company.

3. The value of these platforms lies in their own customers' data. When a customer wants to advertise a CRE property for sale or lease, it submits photographs and various data about the property (referred to herein as CRE information) to a CRE listing platform for display to CRE industry players nationwide. The CRE listing platform then feeds the CRE information into a CRE information platform where industry players can access comprehensive data analytics to help them price and evaluate CRE properties.

4. The two-sided nature of these platforms results in "network effects." The more customers that advertise on the listing platform, the more customers will search for properties on the listing platform. The more customers that search for properties on the listing platform, the more customers will advertise on the listing platform. And the more customers advertise on the listing platform, the more CRE information available to the CRE information platform. These network effects create significant barriers to entry in the nationwide Internet CRE listing and information services markets.

5. CoStar acquired and maintained its dominance not through innovation or price competition, but through relentless acquisition, bullying competitors and its own customers, and executing a multifaceted scheme to eliminate nascent competitors while holding customers' CRE information hostage. Without ready access to CRE information, competitors cannot grow their listing and information platforms to compete on the merits and challenge CoStar's network effects. Indeed, CoStar employees have admitted under oath that 80-90% of the photographs and data on CoStar's platforms is customer-submitted and that an Internet CRE listing or information services platform "doesn't exist without brokers' information."

2

6.      CoStar's scheme has two principal components. First, CoStar coerced the three largest national CRE brokerage firms into long-term agreements under which they agreed not to compete with CoStar in the Internet CRE listing or information services markets. Those brokerages—long-term customers of CoStar—were fed up with the lack of competition in both markets and began planning the launch of a cheaper alternative. But fearing retaliation from CoStar, they instead acquiesced to enterprise-wide agreements with mutual non-competition provisions. The agreements also precluded these three firms from providing their CRE information to any of CoStar's competitors.

7.      Second, CoStar imposed uniform contractual provisions on all its customers that restrained their ability to share their own CRE information with CoStar's competitors. These restraints are contained in various standard form agreements governing customers' use of CoStar's CRE listing and information platforms (collectively referred to herein as the "Customer Terms"). If a customer does not agree to the restraints, they cannot access CoStar's CRE listing or information services platforms. This is a Hobson's choice given CoStar's dominance and customers' heavy reliance on those platforms to do their jobs.

8.      The restraints are also deceptive. They lull customers with the promise that CoStar will have a "non-exclusive license" in customer-submitted content. But other provisions indicate that whatever a customer submits to a CoStar platform becomes part of the CoStar "Product"—no aspect of which can be shared with a CoStar competitor—making the promise of a "non-exclusive license" illusory. Indeed, CoStar employees have flatly told customers that "[w]hen photos are uploaded to CoStar the ownership rights are given up . . . in our Terms and Conditions," and they admitted under oath that "once brokers provided information about listings or pictures to CoStar that those information and pictures became CoStar's property."

3

9.      CoStar enforces its restraints through a variety of mechanisms, including contractual penalties, affixing company watermarks to customer-submitted photographs, imposing IP blocks on competitors attempting to access CRE information on customer websites at the customers' request, scraping competitors' websites, and forcing competitors to use digital image filters. When customers push back on these measures, CoStar's responses range from citing to the Customer Terms to sending threatening emails from outside counsel and imposing litigation holds.

10.     CoStar's scheme has enabled the company to control 80% of both the Internet CRE listing and information services markets nationwide, charge more than double the price of its competitors, increase competitor costs, enhance barriers to customer switching, and deter market entry. CoStar is well-aware of these anticompetitive effects. Its officers tout their "common goal[]" of destroying completion [*sic*, competition] along the way for fun" and wanting to "destroy" more "affordable" competitors that are "innovating faster than us" and "working more closely with their clients."

11.     CoStar's CEO even acknowledged that customers are desperate for competition and "willing to try anything to have an alternative to CoStar." And a CoStar employee admitted under oath that customers "felt hamstrung that they had to use CoStar and LoopNet just to get their listings out there," "resented it because of the pricing and the contract and the rigmarole that came with that," and feel that CoStar "highjacked [their] industry, forcing alternative and competing platforms out of business." Indeed, customers complain that CoStar is "a monopoly that feels more like extortion than a service every time you pay them" and "could really use some . . . competition in the CRE data space."

12. CoStar was previously under an FTC consent order barring the company from "directly or indirectly prohibit[ing] or restrict[ing]" customers from providing CRE listings or information to CoStar competitors. Competitors have accused CoStar of violating that order. While the order has since expired, CoStar continues to knowingly violate bedrock competitive principles and overcharge customers. A federal appeals court recently agreed. *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026).

13. Plaintiff brings this action on behalf of itself and all others similarly situated, under Sections 1 and 2 of the Sherman Act, for damages based on billions of dollars in overcharges and to restore competition to the nationwide Internet CRE listing and information services markets.

## II.  JURISDICTION AND VENUE

14. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

15. **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business or may otherwise be found in this District. Defendants are also headquartered in this District.

16. **Venue.** Venue in this District is proper because Defendants transact business or have registered agents in this District. Venue is also proper in this District because Defendants' conduct, as alleged herein, caused harm to Class members in this District.

17. **Interstate Commerce**. Defendants' conduct as alleged herein substantially affects interstate trade and commerce by harming competition, raising prices, and harming Class members throughout the United States.

5

### III.   PARTIES

**A.   Plaintiff**

18.    Plaintiff Shapiro Hospitalities d/b/a Grand & Co. ("Grand & Co.") is a boutique commercial real estate brokerage firm headquartered in Brooklyn, NY. Grand & Co. has paid fees to Defendant CoStar Group, Inc. for Internet CRE listing and/or information services since at least 2018.

**B.   Defendants**

19.    Defendant CoStar Group, Inc. ("CoStar Group") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1201 Wilson Blvd, Arlington, VA 22209.

20.    Defendant CoStar Realty Information, Inc. ("CoStar Realty") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 1201 Wilson Blvd, Arlington, VA 22209. CoStar Realty is a wholly owned subsidiary of CoStar Group and is CoStar Group's primary operating entity in the United States.

21.    CoStar Group owns and operates an Internet CRE listing services platform (LoopNet) and an Internet CRE information services platform (CoStar). CoStar and LoopNet are two of CoStar Group's "portfolio of brands." LoopNet used to be a separate corporation called LoopNet, Inc. In 2012, CoStar Group acquired LoopNet, Inc., which became a wholly owned subsidiary of CoStar Group. On January 1, 2017, CoStar Group merged LoopNet, Inc. into CoStar Realty. CoStar Realty is the successor in interest to LoopNet, Inc.'s liabilities.

22.    Unless otherwise specified, "CoStar" refers collectively to CoStar Group, Inc., CoStar Realty Information, Inc., LoopNet, Inc. and their subsidiaries and affiliates involved in the conduct alleged herein.

## IV.  FACTUAL ALLEGATIONS

### A.    The Internet CRE Listing Services and Information Services Markets

23.    This action concerns two distinct but related product markets: (i) the Internet CRE listing services market and (ii) the Internet CRE information services market. As explained in detail below, the Internet CRE listing and information services markets offer complementary products, with the former providing necessary inputs for the latter.

### 1.    The Internet CRE Listing Services Market

24.    Internet CRE listing services are online platforms that present organized information about CRE listings available for sale or lease. CRE listing information includes property addresses, ownership and tenant information, sale prices, lease rates, square footage, photographs, property descriptions, and broker contact information, among other things.

25.    Internet CRE listing services allow their customers—primarily CRE brokers, but also property owners, lessors, and others—to both publish and search for listings advertising CRE available for sale or lease on a centralized, structured, and searchable online platform. Customers that publish CRE listings are afforded broad visibility for those listings, while customers that search for CRE listings are afforded a large pool of listings to review in a single online location. In short, Internet CRE listing services amount to an online marketplace that helps facilitate CRE transactions between buyers, sellers, lessors, and lessees. As summarized by the FTC, "CRE listings databases provide two-sided online catalogues of CRE availabilities, allowing users simultaneously to publish and to search for CRE space available for sale and for lease."[1]

---

[1] *In the Matter of Costar Grp., Inc. A Corp., Lonestar Acquisition Sub, Inc. A Corp., & LoopNet, Inc. A Corp.*, No. 111-0172, 2012 WL 3362130, at *2 (MSNET Aug. 29, 2012).

26.     Brokers routinely use Internet CRE listing services when representing buyers, sellers, lessors, or lessees. Internet CRE listing services are generally far more efficient at facilitating CRE transactions than other types of listing services, including CRE listings in print publications, on broker websites, and in online advertisements on non-CRE specific search engines platforms like Google, Bing, and Facebook Marketplace. With a centralized online platform consisting solely of CRE listings and CRE-focused customers, CRE owners, sellers, lessors, lessees, and their broker representatives need not search print publications, each other's websites, or a general online search engine piecemeal.

27.     Internet CRE listing services are therefore distinct from other services that could be used to search for and advertise CRE, many of which have higher search costs and a non-CRE focused customer base. That is why brokers and other CRE industry players often utilize Internet CRE listing services alongside the other forms of listing services noted above, indicating that they are complements, not reasonably interchangeable substitutes. As a result, if the price of Internet CRE listing services increased by a small but significant amount, customers would not substitute away from these services by an amount sufficient to render the price increase unprofitable.

28.     Internet CRE listing services therefore constitutes a relevant product market. Indeed, since at least 2012, the FTC has recognized Internet CRE listing services as a relevant product market, noting that "CRE industry participants require access to listings databases in order to publicize and locate available properties to meet their clients' needs."[2]

### 2.     The Internet CRE Information Services Market

---

[2] *Id.*

29.     Internet CRE information services are online data and analytics used by CRE brokers and others to locate, research, and evaluate CRE sales and leases. These include CRE addresses, prices at which a given property has been offered for sale or lease in the past, prices at which comparable properties have been offered, leased, or sold in the past, lease histories, owner and tenant histories, detailed floor plans, photographs, and vacancy rates, among other things. Internet CRE information services compile this data and make it accessible in a centralized, searchable online database.

30.     CRE information services do not include (i) market analyses, forecasts, projections, or other work product based on CRE information; (ii) software applications or products; or (iii) information or databases relating to the rental or leasing of individual residential units in residential structures.

31.     Many CRE brokers and other industry players rely on Internet CRE information services to analyze and optimize CRE listings, sales, and leases. For example, having access to a centralized, searchable database of CRE statistics helps brokers determine the price at which to both list and make offers on properties for lease and sale. While CRE brokers could collect certain raw data piecemeal from real estate boards, exchanges, or associations, doing so is far more time-consuming, costly, and impractical.

32.     In short, there are no services that are reasonably interchangeable with Internet CRE information services. If the price of internet CRE information services increased by a small but significant amount, CRE customers would not substitute away from these services by an amount sufficient to render the price increase unprofitable. Internet CRE information services therefore constitutes a relevant product market. Indeed, since at least 2012, the FTC has recognized Internet CRE information services as a relevant product market, noting that "CRE

information services provide CRE industry participants with the in-depth information about specific properties necessary for accurate evaluation of potential transactions. CRE information services allow users to access in-depth information about specific properties and to compare similar properties based on location and value."[3]

### 3. Competition in the Internet CRE listing and Information Services Markets.

33. Internet CRE listing and information services are complementary products that CRE brokers and others often use together. For example, brokers using Internet CRE listing services to advertise properties for lease or sale often simultaneously use CRE information services to determine the price at which to advertise those properties for lease or sale. Brokers using Internet CRE listing services to search for properties advertised for lease or sale often simultaneously use CRE information services to analyze those advertised properties and determine the price at which to make an offer for purchase or lease.

### i. Competition in the Internet CRE Listing Services Market

34. CRE listing information is generated by the customers of Internet CRE information services providers, including CRE brokers, property owners, and lessors. Customers submit that information to the Internet CRE listing services provider in the process of creating a CRE listing on the provider's online platform.

35. The Internet CRE listing services provider can then leverage the customer-submitted CRE listing information as data inputs for Internet CRE information services. If the provider offers both Internet CRE listing and information services, it can leverage customer-submitted CRE listing information for its own Internet CRE information services. Alternatively,

---

[3] *Id.*

the Internet CRE listing services provider can sell customer-submitted CRE listing information to a separate company that offers Internet CRE information services.

36.     Internet CRE listing services providers compete in the following three ways. First, Internet CRE listing services providers compete by offering a centralized, user-friendly platform. This includes, among other things, allowing customers to easily submit CRE information to publish in listings; presenting CRE listings to customers in an attractive, digestible, and navigable way; and providing search functionality that allows customers to search for properties using various metrics, filters, and key words.

37.     Second, Internet CRE listing services compete on price. CRE listing services often take up a substantial portion of broker and owner/lessor marketing budgets, so CRE listing services customers are price sensitive.

38.     Third, because Internet CRE listing services providers do not own customer-submitted CRE listing information, they compete for as many customers as possible to both publish and search for CRE listings on their platform. The more customers that publish CRE listings on a given platform, the more customers will use that platform to search for CRE listings. And the more customers search for CRE listings on a given platform, the more customers will publish CRE listings on that platform.

39.     This self-reinforcing mechanism, whereby an increase in the number of users of a service on one side of a market leads to an increase in the value of a service on the other side of the market, is often referred to as "network effects." As applied here, an increase in the number of brokers representing CRE sellers or lessors (or CRE sellers or lessors themselves) that utilize a given CRE listing services platform increases the value of that platform to brokers representing CRE buyers or lessees (or the buyers or lessees themselves). This leads to an increase in the

number of brokers representing CRE buyers or lessees (or CRE buyers or lessees themselves) using the platform, which, in turn, leads to an increase in the value of the platform to brokers representing CRE sellers or lessors (or CRE sellers or lessors themselves). That, in turn, leads to an increase in the number of brokers representing CRE sellers or lessors (or CRE sellers or lessors themselves) using the platform. And so on.

40.     These network effects help create high barriers to entry in the Internet CRE listing services market. For a new entrant to compete with an established Internet CRE listing services platform, it must first establish a critical mass of customers that both advertise and search for CRE. That is, a new entrant must display enough CRE listings to attract buyers, lessors, and their broker representatives to search for CRE on its platform. At the same time, the new entrant must have enough sellers, lessees, and their broker representatives searching for CRE on its platform to make buyers, lessors, and their broker representatives want to list CRE on its platform in the first place. Achieving this requires a significant investment in time and marketing and taking on significant risk. Indeed, the FTC has recognized that "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry."[4]

41.     Entering the Internet CRE listing services market also requires millions of dollars in up front, sunk costs to create an online listing services platform in the first instance, before taking on the significant risk and expense of building an adequate customer base. And then the cost of collecting CRE listing information is high.

---

[4] *In the Matter of Costar Grp., Inc. A Corp., Lonestar Acquisition Sub, Inc. A Corp., & LoopNet, Inc. A Corp.*, No. 111-0172, 2012 WL 1561034, at *39 (MSNET Apr. 26, 2012).

42. As a result, the Internet CRE listing services market is highly concentrated. CoStar controls approximately 80% of the Internet CRE listing services market. CoStar's current competitors in the Internet CRE listing services market are CREXI and Moody's CRE.

### ii. Competition in the Internet CRE Information Services Market

43. Internet CRE information services providers compete in many of the same ways as Internet CRE listing services providers. Internet CRE information services providers compete by offering a centralized, user-friendly platform that allows users to easily search for high quality CRE data and analytics that consist of a variety of useful metrics.

44. Internet CRE information services providers compete on price, as subscriptions to CRE data platforms can be costly—often as much as hundreds or thousands of dollars per month for a small brokerage—making brokerages and other CRE industry players highly price sensitive.

45. Internet CRE information services providers also compete over access to CRE listing information. CRE listing information provides key data inputs for CRE information services. For example, access to information about a property's owners and tenants from CRE listings allows a CRE information service to compile that property's ownership and tenant history. Access to information about a property's sale prices and lease rates from CRE listings allows a CRE information service to compile that property's sale price and lease rate history. Access to a large number of CRE listings in a given metropolitan area allows a CRE information service to compile market data for that metropolitan area.

46. Indeed, an Internet CRE information services platform that cannot access CRE listing information simply cannot compete. Without access to CRE listing information, an

Internet CRE information services platform has no CRE data inputs from which to generate CRE data analytics.

47.    Internet CRE information services platforms access CRE listing information in the following four ways. First, they can scour public sources, including records from state and local government offices (e.g., county/city assessors, county/city recorders, Registries of Deeds, Secretaries of State, etc.), public loan and CMBS data (e.g., Fannie Mae, Freddie Mac, rating agencies, and the SEC), CRE broker websites, and statistics from CRE industry and professional associations.

48.    Second, Internet CRE information services platforms can crowdsource CRE data inputs from their users, often in exchange for free or discounted services.

49.    Third, they can purchase CRE data from major data providers like CoreLogic, ATTOM, BatchData, and the Warren Group.

50.    And fourth, to the extent an Internet CRE information services provider also offers a CRE listing services platform, it can mine its own CRE listing platform for CRE data to leverage. Offering complementary CRE listing and information services platforms not only provides a competitive advantage (as explained above), it offers an additional layer of network effects beyond those achieved by standalone CRE listing services. The more broker-users a company's CRE listing services platform has, the more data inputs are available for the company's CRE information services platform. This makes the CRE information services platform more valuable for brokers, which, in turn, makes brokers using the CRE information services platform more likely to use its complementary CRE listing platform. And that, in turn, provides more data inputs for the CRE information services platform. And so on.

51.     These network effects, combined with the high costs of data collection required to develop an online data analytics platform, create significant barriers to entry in the Internet CRE information services market. Indeed, the FTC has recognized that "[f]or both listings databases and information services, entry and expansion are difficult, costly, and time-consuming," and that the "data-driven nature of the [CRE information services market], coupled with the high costs of data collection and the network effects inherent in the industry, have led to significant barriers to entry and expansion."[5]

52.     As a result, the Internet CRE information services market is highly concentrated with few competitors. CoStar controls approximately 90% of the Internet CRE information services market. CoStar's current competitors in the Internet CRE information services market are CREXI, Moody's CRE, Reonomy, and CompStak.

### 4. Both the Internet CRE Listing and Information Services Markets are National in Scope

53.     Internet CRE listing and information services providers compete at the national level. Internet CRE listing and information services providers offer their platforms to customers throughout the United States. Indeed, they compete for as many customers as possible throughout the United States to obtain the broadest scope of CRE listings and data inputs. As discussed above, the more CRE listings and data inputs, the greater the network effects.

54.     Customers can also utilize Internet CRE listing and information services from providers located anywhere in the United States. For example, while CoStar is located in Arlington, Virginia, customers throughout the United States turn to it for Internet CRE listing and information services. And while CREXI—CoStar's current chief competitor—is located in

---

[5] *Id.* at *39, *40.

Los Angeles, California, customers throughout the United States likewise turn to it for Internet CRE listing and information services. This makes sense because Internet CRE listing and information services are exclusively online and can easily be offered to customers wherever they are located.

55.     Internet CRE listing services providers also offer their customers nationwide visibility for their CRE listings, as well as the ability to search for CRE listings anywhere in the United States. CRE information services providers likewise offer their customers access to nationwide CRE information and data analytics, including the ability to search for CRE information and data analytics anywhere in the United States. Customers can search for and access nationwide CRE listings, nationwide CRE information, nationwide data analytics, and receive nationwide visibility for their listings—no matter where they are located.

56.     Historically, Internet CRE listing and information services providers competed in one or more Metropolitan Statistical Areas (MSAs). CoStar and its competitors used to offer Internet CRE listing and information services on an MSA-by-MSA basis, and customers would subscribe to services for one or more MSAs. But approximately five years ago, CoStar changed its business model to provide Internet CRE listing and information services exclusively on a nationwide basis and to offer only national subscriptions. CREXI—CoStar's chief competitor—also offers exclusively national subscriptions.

57.     The FTC recognized in 2012 that today's geographic area of competition for Internet CRE listing and information services would be nationwide. When the FTC imposed conditions on CoStar's acquisition of LoopNet—its then-primary competitor—that year (discussed in detail *infra* at Section IV.B.1.), the agency noted that "CoStar and LoopNet today are the largest national providers of CRE listings databases and information services both in

terms of comprehensiveness of coverage and of geographic scope," and that any would-be competitors needed the ability to "grow rapidly into a more complete, national listings database and information services alternative to the merged firm."[6]

**B.    CoStar**

58.    CoStar far and away dominates both the Internet CRE listing and information services markets and is widely deemed a monopolist by the CRE industry.

59.    CoStar's customer base consists primarily of CRE brokers, but also includes CRE buyers, sellers, lessors, lessees, investors, and lenders. For many CRE industry players, particularly brokers, access to CoStar's Internet CRE listing and/or information services is considered essential to performing their jobs.

60.    CoStar was originally founded in 1987 by Andrew Florance, who still serves as its CEO and Chairman today. Then called Realty Information Group, the company used Infonet—a precursor to today's Internet—to provide brokers with CRE listing information. It was a valuable service that, within a few years, grew to approximately 300 subscribers paying between $2,000 and $3,000 per month. In the late 1990s, the company went public and was renamed CoStar Group.

61.    Since then, CoStar has grown primarily through acquisitions. CoStar has acquired more than 40 businesses in the last 15 years alone, for approximately $7.3 billion.

62.    CoStar has also grown by aggressively suing its competitors. Since the 1990s, CoStar has filed more than 40 federal copyright-related lawsuits against individuals, its own customers, and competitors large and small. This is far greater than other major companies that are similarly vulnerable to data theft. For example, Bloomberg has filed zero federal copyright

---

[6] *Id.* at *2, 40.

infringement lawsuits, despite its status as the preeminent source of online financial-markets data analytics throughout the United States. And even in the real estate data industry, the second most litigious company (Reis, now Moody's CRE) has filed approximately 11 actions—and only against those using its paid service without paying.

63.    *The Real Deal*, a widely read publication in the CRE industry, put it bluntly: CoStar "uses a playbook of aggressive lawsuits and public-relations warfare against its rivals," and that "its tactics can push them to the brink of collapse or weaken them enough to make soft targets for an acquisition."

64.    CoStar has argued that companies like Craigslist and Getty Images have also filed copyright suits. But Craigslist is, with few exceptions, free for its customers. And Getty Images pays its customers for submitting photographs. In contrast, as detailed further below, CoStar's customers pay *CoStar* hundreds or thousands of dollars per month to submit *their* photographs and data to the company, only so that CoStar can claim copyright protections over those photographs and data to wield against its competitors.

65.    CoStar's own customers have lamented these tactics. For example, a CRE broker told the widely read CRE publication, *Bisnow*, that "CoStar is the only organization that I deal with that is widely hated by its customers. You don't talk to them. They will sell your data to you, and every time they acquire a competitor, they raise their prices."

66.    CoStar customers also lament that they have no alternative, and regularly describe CoStar as having a near total monopoly in both the Internet CRE listing and information services markets. As a *Morningstar* analyst noted, "The reason commercial brokers pay the high rates for CoStar . . . is that there isn't an alternative. . . . [A]dvertising rates are high there as well because CoStar is large and powerful, and there's no alternative to it." Indeed, CoStar subscription fees

18

are often a CRE brokerage's largest monthly expense. As one broker remarked, "[w]e have ZERO marketing budget left right now and Costar/Loopnet nearly breaks us with their fees, but I obviously cannot pull that back for the time being."

67.    Even CoStar's largest clients have lamented how the company squashes competition, which, in turn, allows it to bully its own customers. For example, Elie Feingold, a former CBRE executive, asserted that CoStar "used litigation to suppress innovation in the space," and that, "over time, they have cultivated an adversarial approach to customers."

68.    CoStar's adversarial approach to its own customers manifests in a variety of ways. For one, CoStar charges brokerage customers monthly subscription fees based on the number of brokers and agents the brokerage has—not the number of brokers and agents *actually using the service*. For example, if a brokerage has 50 brokers and agents, it must pay for 50 monthly subscriptions, even if only 30 plan to use it. And if a broker or agent leaves the brokerage, the brokerage has to keep paying for that person's subscription for the full term of the brokerage's subscription agreement.

69.    CoStar also regularly hounds its customers for additional data beyond what they submit to list CRE. CoStar does so by having company researchers call brokers—often once a week or more—to demand additional listing information fields and updates without compensation. If a broker fails to provide this information, CoStar threatens to cancel their subscription.

### 1.    The LoopNet Litigation and Acquisition

70.    LoopNet is currently CoStar's Internet CRE listing services platform and the dominant CRE listing services provider in the United States. But CoStar did not devise or develop LoopNet. Instead, CoStar acquired LoopNet after years of tooth and nail litigation.

71.     LoopNet was founded in 1997, at the height of the dot com bubble. LoopNet was the first CRE data company to crowdsource listing information from brokers. In exchange for submitting their CRE listing information, LoopNet offered an online platform for brokers to efficiently share CRE listing information and facilitate CRE transactions. And, unlike the CoStar website that was accessible only to paid subscribers, many areas of the LoopNet website were accessible to the general public for free—providing brokers with even greater exposure. Many brokerages, including major national brokerages like CBRE, began using LoopNet.

72.     CoStar sensed a competitive threat and quickly sued LoopNet in 1999, contending that it was liable under the then-new Digital Millenium Copyright Act for accepting listing information from brokers who had allegedly stolen it from CoStar's database. Because CoStar had no copyright in broker-submitted data such as a property's square footage or location, the company focused on broker submitted-photographs for property listings, claiming that those photos were taken by CoStar researchers and stolen from CoStar's database.

73.     LoopNet fired back with a suit of its own, claiming that CoStar had stolen CRE listing information from LoopNet databases, including from non-password protected areas of LoopNet's website and from LoopLink—a LoopNet tool that brokers use to display their LoopNet listings on their own websites. In response, LoopNet instituted technological blocks on CoStar researcher IPs, preventing CoStar from accessing CRE listing information at their customer's behest.

74.     In LoopNet's lawsuit, Florance submitted declarations in which he stated that (i) CoStar had "openly and notoriously accessed information on the non-password protected areas of LoopNet's website"; (ii) "commercial brokers often direct CoStar researchers to take their listings from the brokers' own websites or email their listings to CoStar"; (iii) "brokers were

directing CoStar's researchers to LoopNet's website to obtain listing information concerning the broker's own listings, and CoStar researchers in turn were making use of that listing information to update the CoStar database"; and (iv) CoStar had a "right to update its databases from broker websites or from listings on the LoopNet website to which brokers had directed CoStar by email."

75.    Florance's declarations further stated that "[c]ommercial real estate brokers understand that it is critical for their listings to appear within CoStar's comprehensive database of properties for lease and for sale." This is because "[c]ommercial real estate brokers owe a fiduciary duty to the property owners that contract with them to market their listings as widely as is appropriate under the circumstances (and in some states the law requires as much)." The declarations also stated that restricting brokers' ability to market their CRE listings on multiple platforms "would be outrageous."

76.    CoStar and LoopNet resolved their disputes in 2011, when CoStar announced that it would acquire LoopNet for $860 million. The announcement raised significant concerns about competition in both the Internet CRE listing and information services markets. At the time, there were just three competitors in those markets: CoStar, LoopNet, and Xceligent. And CoStar owned 100% of the preferred stock in Xceligent such that acquiring LoopNet would effectively make CoStar a monopolist. Hundreds of CRE professionals petitioned the FTC to stop the acquisition.

77.    Following a merger review, on April 26, 2012, the FTC filed an administrative complaint challenging the acquisition as anticompetitive and imposed significant conditions on its approval. Among other things, CoStar (i) was required to divest all ownership and interest in Xceligent and allow it to exist as an independent competitor; and (ii) could not "directly or

21

indirectly prohibit[] or restrict[]" customers from providing CRE listings or information to CoStar competitors, including from publicly accessible areas of the LoopNet website and LoopLink hosted broker websites, for five years.

78.    Shortly after closing the LoopNet acquisition, brokers began reporting that CoStar drastically raised their subscription costs between 300% to 500% per broker, per month. On an earnings call shortly after the acquisition, CoStar's CFO touted that "[o]n average these LoopNet users were paying only $54 per month," but post-acquisition, they were being converted to "marketing contracts at an average price of approximately $527 per month… for an average monthly price lift of $473 per month."

79.    Such brazen price increases undermine a key procompetitive justification for mergers: lower prices through economies of scale.

### 2.    The CompStak Litigation

80.    In April 2014, CoStar sued four users of CompStak, a CoStar competitor, alleging that they had stolen CRE listing information from CoStar and submitted it to CompStak. Founded in 2012, around the time of the LoopNet acquisition, CompStak offers brokers CRE information services for free in exchange for submitting CRE information. CompStak's model drove rapid growth, making them a potential competitive threat to CoStar.

81.    While CompStak was not a named defendant in the case, CoStar successfully moved the court to order CompStak to reveal the names of the four users accused of data theft. In opposing the motion, CompStak noted that the allegedly stolen data did not come from CoStar or belong to CoStar and was publicly available outside any CoStar websites.

82.    CompStak also stated that CoStar's lawsuit against its users was "an attempt to intimidate and discourage" brokers from "using databases that compete with CoStar," and

accused CoStar of violating the FTC's order that CoStar not restrain brokers from submitting CRE data to competitors. Two months later, CoStar dropped the suit.

### 3.  The RealMassive Litigation

83.    CoStar's intimidation-through-litigation tactics succeeded the next year. In 2015, CoStar brought similar copyright infringement against another competitor, RealMassive, claiming that the company accepted and used CRE photographs from brokers that belonged to CoStar. RealMassive disputed that claim. But its users feared being targets of CoStar, as CompStak's were, and several stopped using RealMassive.

84.    Rather than risk losing more users, RealMassive quickly settled with CoStar. A former RealMassive executive made clear that CoStar's broker intimidation tactics "absolutely worked."

### 4.  The Xceligent Litigation

85.    In 2016, approximately one year before the FTC's conditions on CoStar expired, CoStar sued Xceligent for copyright infringement, claiming that Xceligent had stolen CRE photos from CoStar and LoopNet websites. Since the FTC-mandated divestment, Xceligent had grown significantly, garnering thousands of new customers across major metro areas, thus presenting a competitive threat to CoStar.

86.    Xceligent itself was not accused of directly stealing anything from CoStar and maintained that the photos were taken from public sources. Instead, CoStar accused two independent contractors Xceligent used for data processing of doing so, and CoStar argued that Xceligent was liable for their actions under agency principles in the Digital Millenium Copyright Act. One of the contractors agreed to a stipulation that Xceligent had directed it to copy content

from CoStar websites, but later admitted it had been coerced into signing the stipulation because it did not have the money to fight CoStar in court and wanted a cheap resolution.

87.    The second contractor, located in the Philippines, was the target of local authorities because it had also processed data for a prostitution website that contained child pornography. CoStar leveraged this unfortunate fact about one of Xceligent's independent contractors to wage a massive, unscrupulous PR campaign against Xceligent. For example, CoStar condemned child sex trafficking and Xceligent in the same sentence, issued a statement about Xceligent's "perverted philosophy," and sent brokers across the country brochures detailing Xceligent's alleged copyright violations alongside news about its Philippines-based contractor's impropriety.

88.    In late June 2017, Xceligent filed counterclaims against CoStar for antitrust violations and defamation. Xceligent accused CoStar of perpetrating an anticompetitive scheme to raise competitor costs, drive them out of the Internet CRE listing and information services markets, and entrench its monopoly in those markets, in violation of the conditions imposed by the FTC on CoStar in connection with the LoopNet acquisition.

89.    Xceligent alleged that CoStar, through LoopNet's terms of service, imposed provisions on brokers that restrained them from working with competitors. Xceligent alleged that while the LoopNet terms of service stated the broker is granting LoopNet a "non-exclusive" license in their CRE listing information, LoopNet reserved the right to alter and/or "add digital watermarks" to the broker's listing information. And once LoopNet alters or watermarks the broker's listing information to present it on LoopNet, the terms specify that the listing information becomes "proprietary to LoopNet" and cannot be "reproduce[d]" or "made available . . . in connection with any other listing service." The broker also must agree that its LoopNet

24

listing is CoStar's "copyrighted information." Xceligent alleged that CoStar imposed substantially identical provisions on brokers through LoopLink's and CoStar's respective terms of service.

90.     Xceligent asserted that "a broker who submits a listing to LoopNet provides LoopNet a nonexclusive interest in the listing that LoopNet may effectively convert into an exclusive one, simply by modifying the listing's content, and without notice to the broker. The broker is then forbidden from sharing that information with competitors of CoStar."

91.     Xceligent also complained that CoStar representatives told broker customers that they were "not permitted to support Xceligent publicly, or to share listings with Xceligent," if they wanted to remain CoStar customers.

92.     According to Xceligent, when the company "attempted repeatedly to partner with local CRE brokerage firms to exchange services offered by Xceligent (including services within both the listings database and information services markets) for a copy of the firm's internal CRE database . . . CoStar has blocked, or at least attempted to block, these partnerships through the assertion of control over a broker's own internal CRE database." And CoStar had done so by invoking its terms of use, "claiming that the firm's past or current use of CoStar products precludes the firm from sharing any part of an internal CRE database with any competitor of CoStar because any data that originated from the broker is now comingled with, and cannot be separated from, CoStar-owned data."

93.     The same issue arose with broker-owned photographs. Xceligent alleged that, because the LoopNet and LoopLink terms of use allowed CoStar to watermark any photograph submitted by a broker, CoStar can (and does) display broker owned photographs as the property of CoStar, even though they are not. Doing so created significant confusion among competitors

25

like Xceligent who were being presented with unwatermarked versions of those same photographs by the brokers that owned them.

94.    According to Xceligent, CoStar therefore put "the onus on brokers to keep extensive records sufficient to prove that content is in fact the brokers' own content, and that the brokers' own content has not been comingled with CoStar content or that any comingled content has been removed." But since most brokerages "reduced the size or eliminated their research departments upon the advent of LoopNet, virtually all firms nationwide now have databases that likely contain some amount of comingled content. In this environment, it is nearly impossible and most certainly economically untenable for any broker or brokerage to produce a database untarnished by CoStar content."

95.    Xceligent further accused CoStar of instituting IP blocks on Xceligent researchers attempting to access listings from brokers' LoopLink-hosted websites and public areas of LoopNet at those brokers' specific request. Ironically, CoStar had accused LoopNet of doing the same before acquiring it.

96.    In defending against CoStar's copyright claims, Xceligent maintained that (i) it never used broker data or photos unless specifically instructed by the broker that owned them; and (ii) CoStar chose not to send pre-suit takedown notices that would have allowed Xceligent to investigate and cure copyright violations and avoid litigation.

97.    But Xceligent's legal fees eventually became too much for its parent company (DMGT) to bear. So DGMT put Xceligent into bankruptcy and entered into a $500 million settlement out of Xceligent's bankruptcy estate, effectively ending the company. Xceligent's antitrust counterclaims were never tested. But nearly identical claims brought by another competitor, CREXI, were found plausible by the Ninth Circuit Court of Appeals. *See CoStar*

26

*Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026).

98.    Seven months after putting Xceligent out of business, CoStar increased customer subscription costs by more than 80%.

### 5.  The CREXI Litigation

99.    Commercial Real Estate Exchange, Inc. ("CREXI") was founded in 2015 as an upstart competitor to CoStar, offering both Internet CRE listing and information services. CREXI touts a more technologically advanced, user-friendly interface compared to CoStar's, and a significantly lower price for the same services.

100.    As with Xceligent and its predecessors, CoStar sued CREXI for copyright violations once it became a competitive threat. In November 2019, approximately ten months before CoStar sued, CoStar's CEO lamented to other CoStar officers that CREXI was a "real competitor[]" that "is innovating faster than us" and "working more closely with their clients" than CoStar.

101.    In February 2020, roughly seven months before CoStar filed suit, a CoStar executive stated that CREXI posed a competitive threat because CoStar customers were craving competition and "willing to try anything to have an alternative to CoStar/LoopNet." The executive then announced: "CREXI sucks. I want to destroy them," to which CoStar's CEO responded: "You go Joe. Fight like a son of a bitch who will never die."

102.    In April 2020, approximately five months before CoStar sued CREXI, CoStar's CEO complained that CREXI might be "[t]he fastest growing CRE marketplace . . . passing the old tired too busy to produce something company [i.e., CoStar]. At least we all make a lot more money than they do. (for a little bit longer)." He further lamented that CREXI had "market

27

reports just like CoStar, but they are affordable and included for free. The reports have a lot of good content we do not have." One CoStar executive responded that he and CoStar's CEO shared the "common goal[]" of destroying completion [*sic*, competition] along the way for fun," and that "[y]ou know I hate CREXI, and it triggers me." CoStar's CEO wrote back: "we will kick there [*sic*] asses."

103.   CREXI, like Xceligent, maintained that (i) it only used broker photos at the behest of the brokers that owned them; (ii) CoStar watermarked photos indiscriminately and without regard for whether CoStar actually owned them; and (iii) CoStar intentionally refrained from sending CREXI takedown notices that would have allowed CREXI to investigate and cure copyright violations and avoid litigation.

104.   CREXI also brought antitrust counterclaims similar to those previously brought by Xceligent, alleging that CoStar perpetrated an "anticompetitive scheme to establish and entrench its monopolies over internet commercial real estate (CRE)" listing and information services. CREXI alleged that CoStar's scheme had three prongs: (i) blocking CREXI's access to listings on broker websites that use LoopLink and on the LoopNet website, even where the broker directs CREXI to access listings from its website and/or LoopNet; (ii) conditioning access to CoStar websites and products on contractual terms that restrain brokers' ability to work with competitors; and (iii) indiscriminately modifying and watermarking broker owned photographs, and then claiming copyright ownership over those photographs, in order to "sow confusion about the ownership of CRE photos and make it more difficult for brokers to work with competitors."

105.   CREXI cites examples of brokers seeking to list properties on CREXI and directing the company to access their LoopLink hosted websites for relevant listing information,

only to be blocked by CoStar. In one such example, the broker admitted that it does not maintain listing information outside of its own website:

> "Unfortunately our listings are on the [brokerage] website via Looplink. I do not keep lists of our listings on excel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get you [my brokerage]'s listings at this time."

106.    CREXI's allegations that CoStar's terms of use restrain brokers from working with competitors mirror Xceligent's. According to CREXI, "CoStar imposes terms and conditions on the access and use of CoStar's publicly accessible websites, and brokers' own websites hosted by LoopLink, that purport to convert broker-submitted listing information and photographs into CoStar property. CoStar then deters brokers from sharing their own listings with competitors and threatens brokers that they are in breach of their contracts with CoStar if they do so."

107.    CREXI cites examples of brokers that sought to list properties on CREXI but believed they were contractually restrained by CoStar from doing so. One broker told CREXI that it would be "problematic in regard to our contractual relationship with CoStar/Loopnet (Loopnet) as well as any user of Loopnet," citing contractual provisions that the broker "shall not integrate or incorporate any portion of the [LoopNet listing] Content into any other database" and "shall not use the [LoopNet] Service in any other manner for or in connection with any other listing service or device." Another broker told CREXI that she could not share her listing information because "from what I understand, that would be some sort of breach of contract with LoopNet." A third broker told CREXI that it could not work with the company because it would "conflict[] with our National CoStar agreement."

29

108. CREXI claims that CoStar's practice of unilaterally modifying and watermarking broker photos that it does not own has "created a minefield through which brokers and CoStar competitors must navigate when they seek to use photographs for which CoStar does not hold a valid copyright. Such anticompetitive conduct is an example of the well-known strategy of raising rivals' costs."

109. CREXI notes specific examples of CoStar attempting to intimidate broker customers that send their own photos to CREXI. In one such example, CoStar discovered that one of its broker customers had provided copies of photos that had been watermarked by CoStar—but photos that the broker actually owned—to CREXI. CoStar, through its longtime copyright counsel at Latham & Watkins, sent the broker an email demanding to know "whether you have ever sent to CREXi, or directed anyone else to send to CREXi, any materials derived from CoStar," and demanded that the broker preserve documents. The broker responded that he, his agents, and his brokerage had "never taken things from CoStar and [s]ent them to Crexi." The broker asserted that he "paid for that picture to be taken (thus own the rights)," "posted it on loopnet, and then somehow it appeared on CoStar with CoStar Branding." The broker also asked:

> "Since you are CoStar[']s legal counsel, can you answer why their logo is on my photo? Over the years I have seen CoStar branding on my personal photos often, once they have been uploaded to LoopNet. Thus since CoStar owns Loopnet, I surmise … that CoStar takes photos we brokers upload to LoopNet and brands them with their logo, and puts them on the CoStar platform."

The broker also asked CoStar's attorneys: "[h]ow can I find out how one of my photos came to have CoStar[']s logo on it?" The broker never received an answer.

110. During the course of CoStar's copyright suit, CREXI, at CoStar's behest, instituted a technological image filter to flag photos that CoStar purported to own. CREXI, again at CoStar's behest, then sent the brokers who had submitted photos flagged by the filter notices

that they would be removed from the CREXI platform. Many brokers responded that they, not

CoStar, own the photos, often expressing outrage over CoStar's claims. For example, these

brokers asserted that:

- "These images are NOT owned by CoStar. . . . We use these photos in all of our marketing on various sites including CoStar. We would like a formal apology from Costar for tagging these images that are rightfully [the brokerage]'s."

- "I would like to appeal this immediately. We paid for all of our pictures and they are the property of [my brokerage]. The only thing I can think of here is we also upload those listings/ Pictures to LoopNet. By default Costar adds our pictures to the Costar records- however that does not make it the property of Costar."

- "Again, if you would look at the pictures you would see my leasing sign in the pictures. I personally took every picture in Crexi as shown below. . . . In fact it appears that Costar has taken some of my pictures without MY permission."

- "Its funny how Co Star can steal all of my photos that I have uploaded to my listings there and keep them on their site even when I have removed the property."

- "These photos were taken by ownership years ago, not Costar; it's insane that costar takes over the photos and claims them like that."

- "Well, that's a 'BS' claim by them! I've been marketing that building for 15-20 years, which is well before Costar was even in the Madison market. They've used 'our' photos and then cropped out our watermark and then has the guts to claim those are their photos. Complete BS."

- "I am not sure why CoStar is claiming copyright on these photos however these were taken by us. . . . Attached is the link to the photos we took. This is ridiculous – these are our photos. Have Costar reach out to me directly – again, I am a client of theirs."

- "We pay and own all of our own photos – LoopNet CoStar can suck it. If they want to reimburse me the $6,000 + annually we spend on photos I am happy to have a discussion."

- "I own all images and had my photographer take those photos. I also created the OM/marketing brochure. Costar does not own any. I uploaded the images and OM/marketing brochure to Costar too when I did the listing, but they do not own them."

31

111.    CREXI further accused CoStar of filing baseless suits against CREXI's foreign independent contractors, threatening them with over-the-top damages claims and even criminal contempt, in the hopes that they will be coerced into signing false and misleading declarations implicating CREXI. Indeed, that is what CoStar successfully did to an Xceligent independent contractor. *Supra* at Section IV.B.4.

112.    CREXI's antitrust counterclaims against CoStar were found plausible twice by the United States Court of Appeals for the Ninth Circuit. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026). And CREXI continues to defend against CoStar's copyright claims, which are slated to go to trial.

**C.    CoStar's Internet CRE Listing Services Platform (LoopNet)**

113.    CoStar's CRE listing services platform (LoopNet) is the dominant Internet CRE listing services provider in the United States. The LoopNet platform receives approximately 3.3 million unique visitors each month—nearly ten times the roughly 387,000 monthly visitors to its next largest competitor, CREXI. LoopNet also accounts for approximately 70% of all online CRE listing traffic, including outside Internet CRE listing services platforms, making LoopNet's share of the Internet CRE listing services market even greater.

114.    CoStar touts LoopNet's dominance as "the world's biggest and busiest commercial real estate marketplace[.]" According to CoStar, in 2024 alone, roughly $380 billion in CRE transactions—90% of all CRE transactions that year—involved LoopNet searches.

115.    LoopNet's customer base consists primarily of CRE brokers, but also includes CRE owners, tenants, and investors.

116.    LoopNet allows customers to both advertise and search for CRE properties for sale or lease. The LoopNet website is available for free to the general public, allowing anyone

with Internet access to search and view CRE listings throughout the United States on the LoopNet website. But advertising CRE listings on the LoopNet website requires a paid subscription.

117.　LoopNet's paid subscription model requires customers to pay a fixed dollar amount, per listing, per month. The dollar amount varies depending on the advertising package the broker chooses. LoopNet offers the following four advertising packages in order of cost: Silver, Gold, Platinum, and Diamond. The Silver package is the cheapest and offers the lowest level of visibility and search optimization. The Diamond package is the most expensive and offers the highest level of visibility and search optimization.

118.　LoopNet subscriptions cost between hundreds and thousands of dollars per listing, per month, depending on the advertising package. For example, a customer might purchase a Silver advertising package for three CRE listings at $200 per listing, for a total monthly subscription cost of $600. Another customer might purchase Diamond package for five CRE listings at $1,500 per listing, for a total monthly subscription cost of $7,500 per month.

119.　LoopNet subscriptions have a default initial term of three to six months. They then automatically renew, unless the customer submits a written notice of non-renewal at least 60 days prior to the last day of the initial term or renewal term. This means that a customer who decides they no longer need a LoopNet listing within 60 days of the end of a subscription term has no choice because the subscription has already been locked in for another term.

120.　Historically, brokers paid to have their properties listed on LoopNet by metropolitan area. But LoopNet switched to a nationwide platform across all advertising packages at least five years ago. This switch means that anyone who pays to list a property on LoopNet pays to list it on a single platform that displays all LoopNet listings to all LoopNet

33

users throughout the United States. And anyone using the LoopNet website can search for and access any listing in the United States.

121. LoopNet is so dominant in the Internet CRE listing services market that a LoopNet subscription is widely viewed by CRE brokers as a prerequisite to doing business. A broker that chooses not to advertise a listing on LoopNet would severely limit the visibility of that listing to both the broker's and property owner's detriment. As CoStar's CEO stated, brokers "owe a fiduciary duty to the property owners that contract with them to market their listings as widely as is appropriate under the circumstances (and in some states the law requires as much)."

122. CoStar further cultivates brokers' reliance on LoopNet through a software program called LoopLink. LoopLink integrates with a broker's own website to display the broker's CRE listings on its website as they appear on LoopNet. LoopLink and LoopNet are synched such that when a broker updates a listing on their own website, the listing is automatically updated in identical fashion on the LoopNet website. Likewise, when a broker's listing is updated on LoopNet, it is automatically updated in identical fashion on the broker's website.

123. Given LoopNet's near universality among CRE brokers, brokers that use LoopLink rely on it not only to advertise their CRE listings, but also to warehouse their own CRE listing information. Thus, brokers, especially those with many listings, often do not maintain their CRE listing information outside of their own LoopLink-hosted websites.

124. A wide variety of CRE brokers use LoopLink to display their listings on their own websites, including some of the largest like Cushman & Wakefield, Coldwell Banker Commercial, Colliers, Newmark, Weichert, Harvey Lindsey, Voit, Stream, RE/MAX, Gordon

Brothers, PMZ, Kennedy Wilson, and others. Such brokers maintain between hundreds and thousands of active listings at a time.

**D.     CoStar's Internet CRE Information Services Platform (CoStar)**

125.    CoStar's CRE information services platform (simply called CoStar) is the dominant Internet CRE information services provider in the United States. CoStar controls approximately 80% of the CRE information services market. CoStar also boasts a 90+% renewal rate among customers.

126.    CoStar's customer base includes CRE brokers, lenders, investors, and developers. CoStar provides comprehensive CRE market data and analytics for its customers. CoStar also provides its customers with all CRE listings that appear on LoopNet.

127.    Accessing CoStar requires a paid subscription that costs between $300 and $1,000 per user per month. There is no option to join for free. A CoStar "user" is an individual broker or agent, and CoStar requires brokerages to purchase subscriptions for all of their brokers and agents, whether or not all plan to use CoStar. This gets very expensive very quickly. For example, if a brokerage has a combined 50 brokers and agents, it must purchase 50 CoStar subscriptions irrespective of how many actually plan to use CoStar.

128.    CoStar subscriptions have a minimum term of one year. If a broker or agent leaves their brokerage in the middle of that year, the brokerage remains responsible for that broker or agent's subscription.

129.    CoStar subscriptions renew automatically. If a user does not provide written notice of cancellation at least 60 days before the end of the subscription term, the subscription automatically renews for a one-year period.

130.    Paying for a CoStar subscription affords access to nationwide CRE market data and analytics. Historically, CoStar offered CRE data and analytics subscriptions for one or more

specific metropolitan areas. But CoStar changed its subscription model roughly five years ago to offer only nationwide subscriptions.

131. The CRE data that CoStar warehouses and provides to subscribers is mostly derived from CRE information on LoopNet. In late 2017, CoStar synched its CRE data and analytics platform with LoopNet's listing platform, setting up a continuous data feed from LoopNet to CoStar. When a broker provides CRE photos and listing information to LoopNet, those photos and data are automatically provided to CoStar.

132. LoopNet's dominance in the Internet CRE listing services market therefore reinforces CoStar's dominance in the Internet CRE information services market. More brokers submitting CRE listing information to LoopNet means more CRE data for CoStar. More people using LoopNet to search for CRE means more CRE data for CoStar.

**E.     CoStar's Scheme to Crush Competition in the Internet CRE Listing and Information Services Markets**

133. For decades, CoStar has perpetrated a multifaceted scheme to crush competition in both the Internet CRE listing and information services markets. The scheme includes (i) coercing the three largest CRE brokerages in the country into long-term exclusive deals and naked agreements not to compete with CoStar in the Internet CRE listing and information services markets; and (ii) imposing uniform contractual restraints on all customers designed to limit their ability to work with competitors.

134. As detailed above, CoStar's current and former competitors have called out its anticompetitive conduct. So have CoStar's own customers. For example, one customer complained that it has "[n]o idea how loopnet / costar gets away with what they do as . . . a monopoly that feels more like extortion than a service every time you pay them." Another customer lamented that "CoStar is nearly impossible to compete with . . . could really use some .

. . competition in the CRE data space." Yet another customer asserted that "[i]t's honestly pretty ridiculous no website can really compete with LoopNet and they rip everyone off."

    **1.**    **CoStar Coerced the Largest National CRE Brokerages into Long Term Exclusive Deals and Agreements not to Compete**

135.    In the early 2000s, CoStar's largest customers, CBRE, JLL, and Cushman & Wakefield decided they were sick of paying CoStar's exorbitant subscription costs. Executives from the three companies began meeting to discuss competing with CoStar by consolidating their own CRE data through a non-profit data sharing arrangement and offering a cheaper alternative to CoStar. As the three largest CRE brokerages in the country with the most CRE listings, they were in a unique position because they possessed a repository of CRE data that could be leveraged into a viable CoStar alternative.

136.    The arrangement ultimately fell apart because CoStar had a well-known reputation for bullying its customers, and the brokerages feared retaliation. As a former JLL executive stated, "people were nervous . . . that CoStar was going to find out and stop our service."

137.    Instead of competing as they had originally intended, CBRE, JLL, and Cushman & Wakefield each entered into long-term, enterprise-wide agreements with CoStar. Each of these agreements contained mutual covenants not to compete. The covenants required that CBRE, JLL, and Cushman & Wakefield each agree not to offer Internet CRE listing or information services, and that CoStar agree not to offer CRE brokerage services. Upon information and belief, CBRE, JLL, and Cushman & Wakefield also initially agreed not to provide CRE listings or CRE information to CoStar competitors.

138.    CoStar first entered into an enterprise-wide agreement with Cushman & Wakefield in 2007 with an initial term of ten years. CBRE followed suit, entering into a similar

37

enterprise-wide agreement in 2009 with an initial term of up to eleven years. JLL then entered into an enterprise-wide agreement in 2011 with an undefined initial term. The mutual covenants not to compete were to last two years beyond the expiration of each agreement.

139.    In 2017, Cushman & Wakefield renewed its agreement with CoStar for an additional ten years. In 2019, CBRE renewed its agreement with CoStar for an additional eleven years. Upon information and belief, JLL renewed its 2011 agreement with CoStar. Upon information and belief, as part of their enterprise-wide agreement renewals, CBRE, JLL, and Cushman & Wakefield agreed to limit the amount of CRE listings and CRE information provided to CoStar competitors.

140.    CoStar's reputation for suing competitors and intimidating its own customers successfully deterred Cushman & Wakefield, CBRE, and JLL from competing in the Internet CRE listing and information services markets and instead caused them to enter into naked agreements not to compete in those markets or to work with CoStar's competitors.

141.    CoStar's enterprise-wide agreements with Cushman & Wakefield, CBRE, and JLL not only removed a potential direct competitor from the Internet CRE listing and information services markets, they rendered the massive amounts of CRE information inaccessible by then-current and future CoStar competitors, creating even greater barriers to market entry. Doing so directly contravened FTC policy of fostering much-needed competition in the Internet CRE listing and information services markets by allowing "the largest national CRE brokerage firms . . .  [to] bolster entry efforts—whether through financial investment, CRE information-sharing, or public endorsement—without fear of reprisal."[7]

**2.      CoStar Imposes Uniform Contractual Restraints on all Customers to Limit Their Ability to Work with Competitors**

---

[7] *In the Matter of Costar Grp., Inc.*, 2012 WL 1561034, at *40.

142.    CoStar requires its customers to agree to a host of uniform contractual terms as a precondition to access and use the CoStar or LoopNet platforms. These terms are non-negotiable and apply to all CoStar customers. The terms work together to restrain CoStar customers' ability to work with CoStar and LoopNet competitors.

143.    Whenever a CoStar customer pays for Internet CRE listing services through the LoopNet platform, the customer executes a LoopNet Advertising Agreement. The LoopNet Advertising Agreement expressly incorporates by reference two additional sets of terms: (i) the LoopNet Advertising Agreement Terms and Conditions (the "LoopNet Ad Terms") and (ii) the LoopNet Terms of Use (the "LoopNet TOS"). Both the LoopNet Ad Terms and the LoopNet TOS also apply to a customer's use of LoopLink to advertise listings on their own website.

144.    Whenever a CoStar customer pays for Internet CRE information services through the CoStar platform, the customer executes a CoStar License Agreement. The License Agreement expressly incorporates by reference two additional sets of terms: (i) the CoStar License Agreement Terms and Conditions (the "CoStar License Terms") and (ii) the CoStar Terms of Use (the "CoStar TOS").

145.    The LoopNet Ad Terms, LoopNet TOS, CoStar License Terms, and CoStar TOS are collectively referred to as the Customer Terms.

146.    The Customer Terms are deceptive. On the one hand, they state that a CoStar customer who submits CRE information to the CoStar or LoopNet platforms is granting those platforms a "non-exclusive license" to use that information. But other provisions render that term meaningless and effectively convert CoStar's "non-exclusive license" into an exclusive one.

147.    Once customer-submitted CRE information is uploaded and integrated into the CoStar or LoopNet platform, it becomes part of the CoStar or LoopNet "Product." CoStar and/or

39

LoopNet have exclusive ownership and intellectual property rights in the "Product." And customers cannot share any aspect of the "Product," including the CRE information they submitted to the "Product," with any competitor. Customers are also restrained from sharing their own CRE listings that appear on the CoStar or LoopNet platform with any CoStar or LoopNet competitor through the customers' own websites.

148. While CoStar has made certain revisions to the Customer Terms over time, the terms discussed below have remained substantively identical since at least 2017, unless otherwise specified.

149. **The purported "non-exclusive license" in customer-submitted content for use on the CoStar and LoopNet platforms.** The Customer Terms lull customers into believing they are merely granting CoStar and LoopNet a non-exclusive license in the content they submit to the CoStar and LoopNet platforms. Both the LoopNet Ad Terms and CoStar License Terms state that the customer is only granting LoopNet and CoStar a "non-exclusive license" in the "real estate information . . . provided by Customer." Both the LoopNet TOS and CoStar TOS similarly state that "[w]ith respect to all Submitted Content you elect to submit, upload, post, email or otherwise transmit, you grant Company and its licensees a . . . non-exclusive . . . right and license . . . with respect to such Submitted Content (in whole or part)."

150. The Customer Terms further lull customers by suggesting that customers retain certain non-specific "rights" in and "ownership" over the content they submit to the CoStar and LoopNet platforms. Both the LoopNet Ad Terms and CoStar License Terms state that "if Customer provides LoopNet [or CoStar] with any information or imagery, Customer retains its rights to such information and imagery." Both the CoStar TOS and LoopNet TOS likewise state

that "you retain any applicable ownership rights that you may have with respect to your Submitted Content."

151. **The "irrevocable" ability to "modify," "adapt," and "preserve" customer-submitted content for use on CoStar and LoopNet.** The Customer Terms give CoStar an irrevocable right to modify and integrate customer-submitted-CRE information into the LoopNet and CoStar platforms however it wants and to maintain that information for itself even after the customer stops using LoopNet. Both the LoopNet Ad Terms and CoStar License Terms make clear that CoStar's purportedly "non-exclusive license" includes an "irrevocable" ability to "modify. . . real estate information . . . provided by Customer." Both the LoopNet TOS and CoStar TOS similarly state that CoStar's "non-exclusive" license includes an "irrevocable" ability to "modify . . . Submitted Content (in whole or in part)."

152. The Customer Terms no longer indicate how CoStar modifies customer-submitted content. Prior to 2020, the Customer Terms expressly disclosed that CoStar's "non-exclusive license" included the right to "add digital watermarks to certain parts of your property listing, including photographs." But just two weeks after CREXI its filed antitrust claims pointing out that the Customer Terms improperly claimed ownership over customer-submitted content by asserting the right to "add digital watermarks" to that content, CoStar quickly modified the Customer Terms to deceptively omit that provision while continuing to watermark customer-submitted photographs.

153. The Customer Terms also give CoStar the irrevocable right to control how broker-submitted content is displayed and to whom. Under both the LoopNet TOS and CoStar TOS, CoStar's "non-exclusive license" includes the "irrevocable" and "perpetual" ability to "use," "reproduce," "sublicense," "adapt," "display," "publish," "distribute," or "take any other action

with respect to" customer-submitted CRE information. Both TOSs further allow CoStar to "preserve" customer-submitted content and "disclose" that content "in its sole discretion."

154. **Customer-submitted content becomes part of the CoStar and LoopNet "Product."** Under the Customer Terms, once CoStar integrates customer-submitted content onto the CoStar and LoopNet platforms, it becomes part of the "Product." The LoopNet Ad Terms define the Product as any "product or service provided to [the] Customer" under the LoopNet Advertising Agreement or LoopNet Ad Terms, such as displaying customer-submitted listing photos on the LoopNet website or the customer's own website through LoopLink. The CoStar License Terms similarly define the License Product as "[t]he CoStar Product [i.e., all aspects of the CoStar database], together with any other product expressly included in the . . . [License] Agreement," such as displaying customer-submitted listing photos and data on the CoStar database.

155. The LoopNet TOS defines the Product as "[t]he [LoopNet] Website, Listings, . . . the [LoopNet] Interface, the LoopLink Service, and all other information and content contained in or provided through the [LoopNet] Website, including any updates or modifications thereto, and any information derived therefrom." The CoStar TOS likewise defines the Product as "[t]he [CoStar] Website, and those portions of the Database, Company Information, Analysis, reports and other content contained in or provided through the Website, including any updates or modifications thereto, and any information derived therefrom."

156. **The "Product" is exclusively owned by and "proprietary" to CoStar and LoopNet.** The Customer Terms make clear that once customer-submitted CRE information becomes part of the Product, it becomes "proprietary" to LoopNet. The Customer Terms require CoStar and LoopNet customers to agree that "the Product [or Licensed Product] is comprised of

42

data that is owned by LoopNet [or CoStar] and its licensors and that LoopNet [or CoStar] and its licensors have and shall retain exclusive ownership of all proprietary rights to the Product," and that customers "shall have no right or interest in any portion of the Product[.]"

157.    The Customer Terms further require customers to agree that CoStar maintains exclusive intellectual property rights in the Product, and that customers will not challenge those rights. The Customer Terms require customers to "acknowledge[] that the Product constitutes the valuable property and confidential and copyrighted information of LoopNet [and CoStar] and its licensors and agree[] to (a) comply with all copyright, trademark, trade secret, patent, contract and other laws necessary to protect all rights in such information, (b) not challenge LoopNet's [and CoStar's] and its licensors' ownership of (or the validity or enforceability of their rights in and to) such information, and (c) not remove, conceal, obliterate or circumvent any copyright or other rights management information[.]" Both the LoopNet TOS and CoStar TOS also require the customer to "assign [LoopNet or CoStar] the right to pursue enforcement of copyright and other intellectual property claims against third parties" that copy or distribute the customer's submitted content without "a separate license to use."

158.    **Customers cannot share any portion of the "Product" with a CoStar or LoopNet competitor.** The Customer Terms then expressly forbid customers from providing any aspect of the Product to a CoStar or LoopNet competitor—including customers' own content that was uploaded and integrated into the Product. The Customer Terms expressly state that customers cannot (i) "distribute, disclose, copy, reproduce, make available, upload, post, communicate to the public by telecommunication, display, publish, transmit, assign, sublicense, transfer, provide access to, sell, directly or indirectly, any portion of the Product [or Licensed Product] by any means;" (ii) "store, copy or export any portion of the Product [or Licensed

43

Product] into any database or other software program," such as that of a CoStar or LoopNet competitor; and (iii) "provide[] any portion of the Product [or Licensed Product] to any direct or indirect competitor of, LoopNet [or CoStar] or its affiliates."

159.   The LoopNet Ad Terms and LoopNet TOS further make clear that customers cannot "use, reproduce, publish, or compile any portion of the Product in connection with any other listing service." The CoStar TOS similarly state that customers cannot "use, reproduce, publish, or compile any portion of the Product for the purpose of . . . licensing it"—e.g., to a competitor—"or making it publicly available." And the CoStar License Terms state that customers cannot "use, reproduce, publish, or compile any Information"—defined as "[t]he information, text . . . photographic and other imagery, and data contained in . . . the Database"— "for the purpose of . . . licensing it"—e.g., to a competitor—"or making it publicly available."

160.   **Customers are restrained from sharing their own CRE listings with a CoStar or LoopNet Competitor through their own websites.** The Customer Terms restrain customers from sharing their own listings with competitors through their own websites. Both the LoopNet Ad Terms and CoStar License Terms allow a customer to "display on its own website photographs from the" CoStar or LoopNet platforms "that depict properties that Customer owns, controls, represents or holds exclusives, provided that: [] such photographs may not be altered, including without limitation any watermark;" and "under no circumstances shall such photographs be posted on any website that competes with the Product." In other words, once a customer uploads its own listing photo to the CoStar or LoopNet platform that the customer also displays on its own website, the customer cannot share the same photo with a competitor by referring it to the customer's own website. And if CoStar watermarks the photo on CoStar or

44

LoopNet, the customer cannot display its own listing photo on its own website without the CoStar watermark.

161.    At the same time, both the LoopNet TOS and CoStar TOS state that customers cannot "provide a hyperlink . . . to any Listings"—simply defined as "[a] listing for the sale or lease of commercial real estate"—that appears "in any website or application of a competitor[.]" By forbidding customers from advertising their own CRE listings on a competitor platform with any hyperlink—for example, to the customer's own website—this provision imposes yet another restraint on customers' ability to advertise their own listings outside of the CoStar and LoopNet platforms.

### i.    *CoStar employees understand the Customer Terms to give CoStar ownership over customer-submitted content and to restrain customers' ability to work with competitors.*

162.    The Customer Terms routinely restrain CoStar and LoopNet customers from providing their own CRE information to competitors of CoStar and LoopNet. Indeed, CREXI cites multiple particularized examples in its antitrust counterclaims and exhibits thereto. CoStar's principal response to CREXI's examples is that those customers simply misunderstood the Customer Terms.

163.    But internal correspondence between CoStar representatives and customers demonstrates that CoStar understands its Customer Terms to assert ownership over any and all customer-submitted content and restrain customers' ability to share that same content with CoStar and LoopNet competitors. For example, after discussing the Customer Terms with a CoStar representative, a CoStar customer acknowledged that "we can use the photos uploaded on CoStar on our in-house brochures, as long as we don't upload it to third party websites such as . . . CREXI, etc."

164. When a customer complained to CoStar that "CoStar put their watermark on our renderings, that were very expensive, and caused they [*sic*, them] to be blocked on other sites," a CoStar employee responded that "we can watermark the listings per our Terms and Conditions." The broker then protested that CoStar's restricting her ability to cross-list properties with competitors "is hurting us not helping us. We don't mind others taking the content at all. If anything, it helps market our project. Please remove watermarks from our photos moving forward." The CoStar employee again responded that "per our T&Cs we add them."

165. When a customer asked why CoStar was watermarking photos it does not own, a CoStar Senior Marketing Research Advisor flatly responded that "[w]hen photos are uploaded to CoStar the ownership rights are given up . . . in our Terms and Conditions."

166. A CoStar employee further admitted, under oath, to being repeatedly instructed by supervisors that "once brokers provided information about listings or pictures to CoStar that those information and pictures became CoStar's property." She also admitted that customers regularly express frustration that by "posting on the site [CoStar and LoopNet] retain the rights to the information we provide them [i.e., CoStar and LoopNet] with."

### 3. CoStar Enforces its Uniform Contractual Restraints against Customers and Competitors

167. CoStar enforces the restraints discussed above in at least four ways. First, the Customer Terms impose harsh penalties on customers who violate any of the above restraints. Such penalties include (i) termination of a customer's LoopNet Advertising Agreement and/or CoStar License Agreement; (ii) suspension or blocking of a customer's access to the CoStar and/or LoopNet platforms; (iii) accelerating payment of all customer subscription fees; and (iv) damages, equitable and injunctive relief, and attorney's fees.

168.    These penalties have teeth because customers rely heavily on CoStar and LoopNet as the dominant Internet CRE listing and information services platforms to search for, advertise, and transact in CRE. Indeed, a subscription to CoStar and/or LoopNet is widely viewed as a prerequisite to being a broker or other CRE professional in the first place. CoStar and LoopNet subscription fees are extremely expensive, so accelerated payment can result in a brokerage being liable for tens to hundreds of thousands of dollars all at once. And CoStar is widely known as an aggressive and litigious company, so the threat of suit against a customer is real.

169.    For example, in May 2021, after suing CREXI, CoStar accused Leon Capital—a CRE investment company and longtime CoStar customer—of violating the Customer Terms because it also used, promoted, and provided advisory services to CREXI. CoStar terminated Leon Capital's services and sought full payment for the remainder of the contract term pursuant to Customer Terms' acceleration clause.

170.    When CREXI identified examples of CoStar and LoopNet customers that pushed back against CoStar's copyright claims over their photos that they cross-listed on CREXI, CoStar sent those customers threatening messages. For example, in August 2021, CoStar, through its counsel at Latham & Watkins, sent one such customer an email demanding to know "whether you have ever sent to CREXi, or directed anyone else to send to CREXi, any materials derived from CoStar," and that the broker preserve documents.

171.    Second, CoStar enforces its restraints by watermarking customer-submitted photos in the first instance. When a customer submits a CRE photo to the LoopNet or CoStar platform, CoStar watermarks it with the CoStar logo as a matter of course and without regard for whether the customer owns it. Indeed, a CoStar employee testified under oath that "once

something was uploaded onto CoStar [or LoopNet] pictures got a watermark" automatically "by software in the back end," including broker-submitted photos. Internal CoStar documents also show CoStar employees telling brokers that "the system automatically adds a watermark to any photo uploaded to CoStar. Unfortunately, there isn't anything I can do to remove it." By watermarking customer-submitted photos, CoStar claims them as part of the CoStar or LoopNet Product pursuant to the Customer Terms, no part of which can be shared with a CoStar or LoopNet competitor.

172.    Third, CoStar institutes IP blocks on competitors who attempt to access customers' CRE listings displayed on their own websites through LoopLink. This practice further enforces the restraint against sharing any portion of the Product to a CoStar or LoopNet competitor. Indeed, "LoopLink Service" is expressly included in the definition of Product in the LoopNet Ad Terms and LoopNet TOS.

173.    CoStar customers that seek broader advertising for their listings will often seek to cross-list properties with one or more competitors. To do so, customers will often display listings on their own LoopLink-hosted website and refer a competitor like CREXI to their site to obtain relevant listing information and photographs. When the competitor tries to access the customer's website—at the customer's request—CoStar will recognize the competitor's IP address and block access. LoopLink is a CoStar controlled website hosting platform that is synched with LoopNet, so CoStar is able to monitor and control access to customer listings that are displayed on the customers' own websites through LoopLink.

174.    Fourth, CoStar scrapes competitor websites to look for customer cross-listings. For example, in March and April 2020, just months before suing CREXI, CoStar scraped CREXI's website for both competitive intelligence and evidence that CREXI accepted CoStar

watermarked photos so that CoStar could pursue copyright claims over such photos. When CREXI brought CoStar's copyright claims to customers' attention over the photos they uploaded to CREXI, the customers often asserted that they—not CoStar—owned the photos. CoStar's scraping practices enforce the Customer Terms' provisions that (i) prevent customers from sharing any portion of the CoStar or LoopNet Product with any competitor; (ii) bar customers from challenging CoStar's intellectual property rights in all aspects of the Product; and (iii) require customers to assign CoStar the right to pursue intellectual property claims against competitors like CREXI that copy or distribute the customers' content, even at the customers' request.

175.    Fifth, CoStar demands that competitors adopt technological "filters" to detect photographs on their platforms that match watermarked photographs on the CoStar and LoopNet platforms. For example, CREXI agreed to implement an image filter at CoStar's behest to detect photographs on the CREXI platform that match watermarked photographs on CoStar and LoopNet platforms. CREXI then—again, at CoStar's behest—notified customers whose listing photos matched watermarked photos on CoStar and LoopNet that they would be removing such photos from the CREXI platform. Numerous brokers pushed back, complaining that they—not CoStar—owned the photos. CoStar's imposition of such filters enforces the Customer Terms' provisions that (i) prevent customers from sharing any portion of the CoStar or LoopNet Product with any competitor; (ii) bar customers from challenging CoStar's intellectual property rights in all aspects of the Product; and (iii) require customers to assign CoStar the right to pursue intellectual property claims against competitors like CREXI that copy or distribute the customers' content, even at the customers' request.

49

176.    CoStar has attempted to argue in the CREXI litigation that certain customers' apparent ability to maintain the same listing on both CoStar's/LoopNet's platform and CREXI's platform means that the Customer Terms cannot plausibly restrain brokers from working with competitors. This argument failed twice at the Ninth Circuit, and failed to entice the Supreme Court to grant certiorari. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026). And for good reason. Customers need not be dissuaded by the Customer Terms themselves for those terms to restrain their ability to engage with CoStar competitors—although many are. As explained above, the Customer Terms are intentionally deceptive, lulling customers with the promise of a mere "non-exclusive license" that is rendered illusory only upon a close reading of other provisions.

177.    Larger brokerages that can afford in-house or outside counsel to review the Customer Terms tend to realize that CoStar effectively claims ownership over what they submit to the CoStar and LoopNet platforms and are in turn dissuaded from cross-listing with competitors. Smaller brokerages that cannot readily afford sophisticated counsel to review and interpret the Customer Terms are more likely to attempt cross-listing. But they are nonetheless restrained by the Customer Terms due to CoStar's technological measures to enforce those terms, including watermarking customer photos, blocking competitor IP addresses from customer websites hosted by LoopLink, scraping competitor websites to force them to remove customer-submitted photos, and imposing image filters on competitors for the same purpose. In short, even if a customer is not prevented from using a competitor by the Customers Terms alone, CoStar has implemented enforcement measures to enhance the chances that they are. And it has worked.

**F.**     **After Indication that the Ninth Circuit might Uphold CREXI's Antitrust Claims at the Pleading Stage, CoStar Amended the Customer Terms to Include a Purported Class Action Waiver Provision to Evade Accountability with Customers.**

178.     In the CREXI litigation, the district court initially ruled that CREXI had failed to state a cognizable antitrust claim against CoStar. CREXI appealed that ruling and obtained a unanimous, full reversal in the Ninth Circuit Court of Appeals. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075 (9th Cir.), *opinion amended and superseded on denial of reh'g*, 150 F.4th 1056 (9th Cir. 2025), *cert. denied*, 2026 WL 795193 (U.S. Mar. 23, 2026). In October 2024, the Ninth Circuit held oral argument on CREXI's appeal and indicated a willingness to rule that CREXI had adequately alleged antitrust claims against CoStar for those claims to proceed to discovery.[8]

179.     CoStar quickly revised its Customer Terms to include a provision stating: "EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO PARTICIPATE IN A CLASS OR COLLECTIVE ACTION AGAINST THE OTHER PARTY IN ANY DISPUTE OR PROCEEDING (WHETHER BASED ON CONTRACT, STATUTE, TORT, OR ANY OTHER THEORY)." This purported class waiver provision appeared for the first time in the LoopNet Ad Terms on February 5, 2025, in the LoopNet TOS on May 7, 2025, in the CoStar License Terms on February 6, 2025, and in the CoStar TOS on May 8, 2025.

180.     The LoopNet Ad Terms state that "[i]f you are a current LoopNet subscriber and have executed your agreement prior to February 6, 2025 click here to access the Terms and Conditions governing your agreement." The CoStar License Terms likewise state that "[i]f you are a current CoStar subscriber and have executed your agreement prior to February 6,

---

[8] Available at: https://www.ca9.uscourts.gov/media/audio/?20241009/23-55662/.

2025 click here to access the Terms and Conditions governing your agreement." Both hyperlinks bring customers to prior versions of the LoopNet Ad Terms and CoStar License Terms, none of which contains a class waiver provision. So, customers, including Plaintiff, that executed a LoopNet Advertising Agreement or CoStar License Agreement before February 5 or 6, 2025 are not subject to the class waiver provision in the first instance.

181.    While the current LoopNet TOS and CoStar TOS contain their own class waiver provisions, they do not apply to customers, including Plaintiff, that entered into a LoopNet Advertising Agreement or CoStar License Agreement before February 5 or 6, 2025. The LoopNet TOS states that "if you and Company have entered into a separate Advertising Agreement that covers your use of a Company service, the terms and conditions of such agreement shall control with respect to such service to the extent they are inconsistent with these Terms of Use." The CoStar TOS likewise state that "if you and Company have entered into a separate License Agreement that covers your use of a Company service, the terms and conditions of such agreement shall control with respect to such service to the extent they are inconsistent with these Terms of Use." Because pre-February 5 and 6, 2025 versions of the LoopNet Ad Terms and CoStar License Terms do not contain a class waiver provision, they are inconsistent with the class waiver provision in the current versions of the CoStar TOS and LoopNet TOS, and therefore the class waiver provisions do not apply to customers that executed a LoopNet Advertising Agreement or CoStar License Agreement before February 5 or 6, 2025.

182.    The CoStar TOS and LoopNet TOS themselves make clear that CoStar did not provide customers, including Plaintiff, with any notice of the new class waiver provision. Both TOSs state that "Company reserves the right, in Company's complete and sole discretion, to change these Terms of Use at any time by posting revised terms on the Product. It is your

responsibility to check periodically for any changes Company may make to the Product and these Terms of Use. Your continued use of this Product following the posting of changes to these terms or other policies means you accept the changes." In other words, CoStar expressly disclaims all responsibility to provide customers notice of modifications to either the CoStar TOS or LoopNet TOS, including the addition of the class waiver provision. Merely posting a revised TOS "on the Product" (i.e., the CoStar or LoopNet website) does not provide notice because hyperlinks to the TOS are posted in small font, in the bottom right corner of the CoStar and LoopNet homepages. And navigating to those hyperlinks requires significant scrolling to the bottom of the homepage.

183.    Customers, including Plaintiff, also did not receive notice of the class waiver provision under the plain terms of the LoopNet Ad Terms and CoStar License Terms. Both the LoopNet Ad Terms and CoStar License Terms make clear that they, along with the corresponding LoopNet Advertising Agreement and CoStar License Agreement, "will **automatically renew for successive periods equal to the initial term**, unless at least 60 days prior to the last day of the initial term or renewal term, as applicable, either party has provided to the other **written notice of nonrenewal**" of the LoopNet Advertising Agreement or CoStar License Agreement. CoStar does not provide customers with advance notice of renewal or new contract terms.

184.    So, for example, if a customer did not notify CoStar at least 60 days in advance that they did not wish to renew their December 2024 LoopNet Advertising Agreement or CoStar License Agreement without the class waiver provision, those agreements would have automatically renewed with the class waiver provision, but without notice or assent to that provision. And those agreements will continue to automatically renew without notice or assent to

the class waiver provision unless the customer submits a written notice of non-renewal at least 60 days prior to the last day of the contract term.

185.    Customers routinely feel deceived by CoStar's auto renewal practices. For example, in March 2026, a customer complained that "my subscription was renewed without my consent, and when I expressed that I did not want to continue, I was met with resistance instead of resolution." In November 2024, a customer complained that CoStar "auto-renew[ed] me for Year 2 at a new annual rate of $6,500+. The timing of their invoice's artfully crafted arrival fell just beyond the close of my cancellation window." In April 2025, a customer complained that CoStar was a "[c]omplete waste of money. I found out about the 60 day cancellation rule too late. . . . If I tried that in my real estate business I'd be sued every week. . . . Sneaky Costar didn't notify me."

186.    Moreover, the Customer Terms are standard contracts of adhesion. If a customer wishes to opt out of the class waiver provision, they cannot do so unless they opt out of using the CoStar and LoopNet platforms altogether. That is a significant decision because CoStar and LoopNet are far and away the dominant Internet CRE listing and information services providers. And given the dearth of alternatives due to CoStar's scheme, many customers feel they don't have much of a choice but to accept CoStar's terms.

187.    Finally, CoStar designed the Customers Terms to be deceptive. As explained above, the Customer Terms first lull customers into believing they are merely granting CoStar or LoopNet a non-exclusive license in their content, while other provisions effectively render that license into an exclusive one. The Customer Terms also omit to disclose that CoStar watermarks customer-submitted photographs in the first instance. Indeed, many customers often believe initially that they can cross-list on competitor platforms, only to later face IP blocks on their own

54

websites, notices that their photos cannot be uploaded to, or need to be removed from, competitor platforms, or direct threats from CoStar as means to enforce the Customer Terms. And both the illusory promise of a non-exclusive license and the omission of any disclosure that CoStar will watermark customer photos are highly material and go to the core of the Customer Terms as a whole.

## V.    MARKET POWER

188.    CoStar possesses market power in both the nationwide Internet CRE listing and information services markets. CoStar has possessed and continuously maintained market power in both markets since at least the early 2000s through the present.

### A.    Direct Evidence of CoStar's Market Power

189.    CoStar has demonstrated its ability to directly control and impose supracompetitive prices in both the nationwide Internet CRE listing and information services markets. After acquiring LoopNet, CoStar raised customer prices by 300% to 500%, and CoStar's CFO boasted about raising average prices from $54 per month to $527 per month. After putting Xceligent into bankruptcy, CoStar raised customer prices by 80%.

190.    In 2018, CoStar's CEO noted that the company's focus on "pricing integrity . . . and not accepting discounted or under-license contracts[,]" resulted in "an 80% increase in the average price per new broker user-licensed" over a six-month period.

191.    In 2019, CoStar's CEO explained that the company identifies "underpriced accounts" and "brings them up" via regular price increases of 6% or 7%, far greater than the average 3% annual increase in the nationwide Internet CRE listing and information service markets.

192.    In 2021, CoStar's CFO noted that the company was "going to begin normal price escalations on CoStar Suite" due to "renewal rates moving [from] 94.5[%]… [to] up over 97%."

193.    CoStar perpetrated these and other price increases in the face of significantly cheaper competition. For example, CREXI's Internet CRE listing and information services cost at least 50% less than CoStar's. Yet CoStar has and continues to charge supracompetitive prices without losing market share.

194.    CoStar customers also regularly complain about CoStar's supracompetitive pricing but remain customers due to CoStar's market power and the lack of meaningful competition. For example, brokers lament that CoStar's pricing "feels more like extortion than a service every time you pay them"; "we would like to see a good alternative to costar but at this point I don't think we are prepared to cut the cord"; "It's honestly pretty ridiculous no website can really compete with LoopNet and they rip everyone off"; and "We have ZERO marketing budget left right now and Costar/Loopnet nearly breaks us with their fees, but I obviously cannot pull that back for the time being."

**B.      Indirect Evidence of CoStar's Market Power**

195.    CoStar possesses approximately 80% of both the Internet CRE listing and information services markets.

196.    Competitors, customers, and CRE industry observers consistently label CoStar a monopolist in both the Internet CRE listing and information services markets. For example, both Xceligent and CREXI accused CoStar of possessing monopoly power in both markets. *Morningstar Research* has deemed CoStar a "borderline monopoly" with "no true competitive threats." And CRE brokers have petitioned the government to "Break the CoStar-LoopNet Monopoly."

197.    CoStar also admits its dominance in both the Internet CRE listing and information services markets, touting that approximately 90% of all CRE transactions in 2024 involved

56

LoopNet searches, and "nearly 90% of all CRE activity" in general "occurs on a CoStar Network." CoStar has also proclaimed that it is "driving 18X more activity than [its] nearest competitor."

198.    This is why CRE brokers who choose to submit listings to competitor platforms continue to also submit their listings to CoStar—and to pay CoStar's supracompetitive prices. CoStar's market power is such that brokers cannot forego advertising in the CoStar ecosystem because they will lose out on significant coverage. Indeed, a CoStar employee admitted under oath that brokers "felt hamstrung that they had to use CoStar and LoopNet just to get their listings out there" and "resented it because of the pricing and the contract and the rigmarole that came with that."

199.    Finally, as discussed *supra* at Section IV.A.3., both the Internet CRE listing and information services markets are characterized by high barriers to entry, including network effects and high up-front costs. And both markets are characterized by inelastic demand. As discussed above, brokers routinely complain about CoStar's supracompetitive prices but cannot substitute away to other forms of CRE listing and information services.

## VI.    ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

200.    CoStar's anticompetitive scheme has resulted in myriad anticompetitive effects, including higher prices, diminished customer choice, enhanced market concentration, increased market power, and the foreclosure of meaningful competition. Each prong of the scheme independently caused anticompetitive effects. Each prong of the scheme also worked together as a whole to cause anticompetitive effects.

### A.    Direct Effects

201.    Coercing the three largest CRE brokerages into agreements not to compete in the CRE listing and information services markets eliminated a potential direct competitor from both

57

markets, leading to higher prices and diminished choice for consumers. As discussed *supra* at Section IV.B.1. and 4., each time CoStar eliminated a competitor from those markets, CoStar significantly raised prices. And as discussed *supra* at Section V., CoStar customers feel locked into using CoStar despite its high pricing because there is no viable alternative.

202. Coercing the three largest CRE brokerages into exclusive agreements not to provide CRE listings or CRE information, or to provide limited CRE listings or CRE information, to CoStar's competitors also led to higher prices and decreased consumer choice. Given that the three largest CRE brokerages each possess large amounts of CRE information— listings and data inputs for an Internet CRE listing and/or information services platform— depriving competitors of access to that information impeded their ability to compete with CoStar. As discussed *supra* at Section IV.A.3., both the Internet CRE listing and information services markets are characterized by high barriers to entry and network effects that require access to large amounts CRE information. Preventing access to that CRE information impeded competitors' ability to offer viable alternatives to the CoStar and/LoopNet platforms, thereby allowing CoStar to raise prices, which it did. Indeed, the FTC has recognized that competition is bolstered when "the largest national CRE brokerage firms, can bolster entry efforts" through "CRE information-sharing . . . without fear of reprisal."[9]

203. Imposing contractual restraints on customers' ability to provide their CRE information to competitors further led to higher prices and decreased consumer choice. Restraining customers' ability to work with competitors limits CoStar competitors' ability to build a customer base and obtain sufficient CRE listings and data to compete. As discussed *supra*

---

[9] *In the Matter of Costar Grp., Inc. A Corp., Lonestar Acquisition Sub, Inc. A Corp., & Loopnet, Inc. A Corp..*, No. 111-0172, 2012 WL 1561034, at *40 (MSNET Apr. 26, 2012).

at Section IV.A.3., both the Internet CRE listing and information services markets are characterized by high barriers to entry and network effects that require access to large amounts CRE information. Preventing access to that CRE information impeded competitors' ability to offer viable alternatives to the CoStar and LoopNet platforms, thereby allowing CoStar to raise prices, which it did. Indeed, the FTC has recognized harm to competition where CoStar "directly or indirectly prohibits or restricts a Customer from providing any CoStar Competitor . . . CRE Listings or CRE Information."[10]

## B. Indirect Effects

204. Coercing the three largest CRE brokerages into agreements not to compete in the CRE listing and information services markets bolstered CoStar's market power, enhanced market concentration, and foreclosed potentially meaningful competition in both markets. Eliminating a potential direct competitor led to CoStar controlling 80% of the Internet CRE listing and information services markets. As the FTC recognized, eliminating potential direct competitors to CoStar in the Internet CRE listing and information services markets "increase[es] the likelihood that CoStar will exercise market power unilaterally."[11] It also enhanced market concentration because there are few competitors in the Internet CRE listing and information services markets to begin with.

205. Coercing the three largest CRE brokerages into exclusive agreements not to provide CRE listings or CRE information, or to provide limited CRE listings or CRE information, to CoStar's competitors also bolstered CoStar's market power, enhanced market concentration, and foreclosed potentially meaningful competition in the Internet CRE listing and

---

[10] *Id.* at *14.

[11] *Id.* at *3.

information services markets. As discussed *supra* at Section IV.A.3., both the Internet CRE listing and information services markets are characterized by high barriers to entry and network effects that require access to large amounts CRE information. Because the three largest CRE brokerages each possess large amounts of CRE information, depriving competitors of access to that information impeded their ability to compete with CoStar by raising their costs and barriers to entry. *Supra* at Section IV.E.1. Doing so led to CoStar controlling 80% of the Internet CRE listing and information services markets. Indeed, the FTC has recognized that competition is bolstered when "the largest national CRE brokerage firms, can bolster entry efforts" through "CRE information-sharing . . . without fear of reprisal."[12]

206.    Imposing contractual restraints on customers' ability to provide their CRE information to competitors has further bolstered CoStar's market power, enhanced market concentration, and foreclosed potentially meaningful competition in the Internet CRE listing and information services markets. As discussed *supra* at Section IV.A.3., both the Internet CRE listing and information services markets are characterized by high barriers to entry and network effects that require access to large amounts of CRE information. Depriving competitors of access to that information impeded their ability to compete with CoStar by raising their costs and barriers to entry. This, in turn, led to CoStar controlling 80% of the Internet CRE listing and information services markets. As the FTC previously recognized, it is anticompetitive for CoStar to "directly or indirectly prohibit[] or restrict[] a Customer from providing any CoStar Competitor . . . CRE Listings or CRE Information."[13] And as a CoStar employee admitted under oath, 80-90% of the CRE listing information and data on the CoStar and LoopNet platforms is

---

[12] *Id.* at *40.
[13] *Id.* at *14.

customer submitted and an Internet CRE listing or information services platform "doesn't exist without brokers' information."

207. Enforcing the Customer Terms through IP blocks on LoopLink-hosted customer websites also raised the cost for CoStar customers to switch to, or multihome with, a CoStar competitor. By blocking a convenient channel through which brokers regularly share CRE information—their own websites—CoStar created a higher friction environment in which a customer would have to maintain separate copies of their listings outside their own website to work with a CoStar competitor. Preventing CoStar customers from providing competitors with their own listings through hyperlinks to their own website raises customer switching and multihoming costs for the same reason.

208. Enforcing the Customer Terms by watermarking customer-owned CRE photos adds an additional barrier to entry and further raises competitor costs and customer switching and multihoming costs. Watermarking customer-owned photos creates confusion among CoStar competitors seeking to use the same photo provided by the customer. A competitor must spend time and resources reevaluating whether the customer owns the photo it submitted and whether the competitor can use the photo on their platform. CoStar's track record of relentlessly suing competitors creates further uncertainty and deterrent effects. And customers must spend time and resources convincing a competitor that they, not CoStar, own the photos they submit. Enforcing the Customer Terms through scraping and digital filter software results in the same effects.

209. These anticompetitive effects are not a mystery to CoStar. CoStar's CEO has emphasized that easy access to publicly available CRE information is critical to competition in the Internet CRE listing and information services markets. CoStar officers have touted the "common goal[]" of destroying completion [*sic*, competition] along the way for fun" and

acknowledged that CoStar customers are "willing to try anything to have an alternative to CoStar/LoopNet." And a CoStar employee has admitted under oath that CoStar customers "felt hamstrung that they had to use CoStar and LoopNet just to get their listings out there," "resented it because of the pricing and the contract and the rigmarole that came with that," and feel that CoStar "highjacked [their] industry, forcing alternative and competing platforms out of business."

## C.      There is no Procompetitive Justification for CoStar's Scheme

210.    There is no valid procompetitive justification for CoStar's anticompetitive scheme as alleged herein. The scheme's sole purpose is to raise prices for customers, prevent them from working with competitors, and increase barriers to entry and customer switching.

211.    CoStar's scheme has not resulted in lower prices, increased customer choice, or increased innovation. Indeed, it has had the opposite effect. Any claimed procompetitive justification for CoStar's scheme is pretextual.

## D.      Antitrust Injury

212.    Defendants' violations of the antitrust laws have caused Plaintiff and members of the Class to pay higher prices for Internet CRE listing and information services than they would have in the absence of Defendants' anticompetitive conduct, and, as a result, Plaintiff and members of the Class have suffered damages in the form of overcharges paid for Internet CRE listing and information services. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## VII.  CLASS ALLEGATIONS

213.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

All persons and entities who paid any fees to CoStar or LoopNet for Internet CRE listing or information services at any time during the period of April 14, 2022 ("Class Period") until Defendants' unlawful conduct and their anticompetitive effects cease to persist.

214.    The following persons and entities are excluded from the above-described proposed Class:

- Defendants and their counsel, officers, directors, management, employees, subsidiaries, and affiliates;

- All governmental entities;

- Cushman & Wakefield Ltd. and its officers, directors, management, employees, subsidiaries, and affiliates;

- CBRE Group, Inc. and its officers, directors, management, employees, subsidiaries, and affiliates;

- Jones Lang LaSalle Incorporated and its officers, directors, management, employees, subsidiaries, and affiliates;

- All Counsel of Record; and

- The Court, Court personnel, and any member of their immediate families.

215.    The Class is so numerous as to make joinder impracticable. Plaintiff does not know the exact number of Class members because such information is presently in the exclusive control of Defendants. Plaintiff believes that due to the nature of the industry there are likely, at a minimum, hundreds of thousands of Class members in the United States and its territories.

216.    Common questions of law and fact exist as to all members of the Class. Plaintiff and the Class were injured by the same unlawful scheme, Defendants' anticompetitive conduct was generally applicable to all members of the Class, and relief to the Class as a whole is appropriate. Common issues of fact and law include, but are not limited to, the following:

63

- Whether Defendants entered into agreements with Cushman & Wakefield, CBRE, and/or JLL under which Cushman & Wakefield, CBRE, and/or JLL agreed not to compete with Defendant in the Internet CRE listing and/or information services markets;

- Whether Defendants entered into agreements with Cushman & Wakefield, CBRE, and/or JLL under which Cushman & Wakefield, CBRE, and/or JLL agreed not to provide CRE listings or CRE information to Defendants' competitors in the Internet CRE listing and/or information services markets;

- Whether Defendants entered into agreements with Cushman & Wakefield, CBRE, and/or JLL under which Cushman & Wakefield, CBRE, and/or JLL agreed to limit the CRE listings and/or CRE information provided to Defendants' competitors in the Internet CRE listing and/or information services markets;

- Whether the Customer Terms restrained Defendants' customers' ability to provide CRE listings and CRE information to Defendants' competitors;

- Whether Defendants enforced the Customer Terms through penalty provisions contained in the Customer Terms;

- Whether Defendants enforced the Customer Terms by watermarking customer-submitted photographs;

- Whether Defendants enforced the Customer Terms through IP blocks on competitors seeking to access customer websites hosted by LoopLink at the customer's request;

64

- Whether Defendants enforced the Customer Terms by scraping competitor websites;

- Whether Defendants enforced the Customer Terms by imposing image filters on competitors;

- Whether the Customer Terms harmed competition in the Internet CRE listing and/or information services markets;

- Whether the Customer Terms are deceptive;

- Whether the anticompetitive scheme alleged herein, in whole or in part, violates the federal antitrust laws;

- Whether the anticompetitive scheme alleged herein, in whole or in part, caused injury to Plaintiff and other members of the Class;

- Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on Internet CRE listing or information services;

- The appropriate class-wide measure of damages; and

- The nature of appropriate injunctive relief to restore competition in the Internet CRE listing and information services markets.

217. Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for Internet CRE listing and information services.

218. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

219.    Plaintiff has retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

220.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

221.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

222.    Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VIII.  CAUSES OF ACTION

### COUNT ONE

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

### Agreements with CBRE, JLL, and Cushman & Wakefield Not to Compete

223.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

224.    Beginning in 2007 and continuing through the present, CoStar entered into enterprise-wide agreements with CBRE, JLL, and Cushman & Wakefield containing mutual

66

covenants not to compete. Under those agreements, CBRE, JLL, and Cushman & Wakefield agreed not to offer Internet CRE listing services or Internet CRE information services.

225.    CBRE, JLL, and Cushman & Wakefield had intended to compete with CoStar by consolidating their CRE data and offering a cheaper alternative but abandoned that effort because of CoStar's well-known reputation for retaliating against customers and competitors.

226.    These long-term agreements not to compete affect a substantial amount of interstate commerce, unreasonably restrain trade and substantially foreclose competition in the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market. CBRE, JLL, and Cushman & Wakefield were uniquely positioned to sponsor, support, or become a meaningful competitive alternative because each owns and controls large amounts of CRE listings and data. In markets characterized by strong network effects, high data-collection costs, and other substantial barriers to entry, preventing those firms from competing deprived the market of a potentially viable competitor.

227.    CoStar cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers. The agreements suppressed a well-positioned competitive alternative and insulated CoStar from price competition. Any purported procompetitive justification could have been achieved through means far less restrictive than long-term covenants barring these firms from offering a competitive alternative in Internet CRE listing and information services markets.

228.    As a direct and proximate result of these agreements not to compete, Plaintiff and members of the Class have suffered injury to their business and property. That injury includes paying higher prices for Internet CRE listing and information services than they would have paid absent CoStar's agreements not to compete, receiving those services in markets with diminished

67

competition and reduced innovation, and facing reduced choice among providers of Internet CRE listing and information services. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent.

229.    Plaintiff and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

230.    Plaintiff and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

## COUNT TWO

### Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

### Exclusive Dealing and De Facto Exclusive Dealing Through CoStar's Agreements with CBRE, JLL, and Cushman & Wakefield

231.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

232.    Beginning in 2007 and continuing through the present, CoStar entered into enterprise-wide agreements with CBRE, JLL, and Cushman & Wakefield under which those firms agreed not to provide CRE information and/or provide limited CRE information to CoStar competitors.

233.    These exclusive dealing agreements affect a substantial amount of interstate commerce, unreasonably restrain trade, and substantially foreclose competition in the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market. As the three largest CRE brokerages in the country, CBRE, JLL, and Cushman & Wakefield own and control large amounts of CRE information. In markets characterized by strong network effects, high data-collection costs, and other substantial barriers to entry,

foreclosing rivals from access to large amounts of CRE information increased those barriers to entry.

234. The natural and intended effect of these agreements was to weaken current and future competitors, preserve CoStar's market power, increase prices, and insulate CoStar from competition on the merits. These agreements also contravened the FTC's stated goal of allowing the largest national CRE brokerages to bolster CoStar competitors' entry efforts.

235. CoStar cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers. Any legitimate business relationship between CoStar and these brokerages could have been achieved through means far less restrictive than long-term agreements restraining their ability to provide CRE information to CoStar's competitors. The function of these agreements was to foreclose competitors from access to critical inputs for their Internet CRE listing and information services platforms.

236. As a direct and proximate result of these exclusive dealing agreements, Plaintiff and members of the Class have suffered injury to their business and property. That injury includes paying higher prices for Internet CRE listing and information services than they would have paid absent CoStar's exclusive dealing agreements, receiving those services in markets with diminished competition and reduced innovation, and facing reduced choice among providers of Internet CRE listing and information services. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent.

237. Plaintiff and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

238. Plaintiff and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

## COUNT THREE

**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

**De Facto Exclusive Dealing Through CoStar's Standard-Form Customer Terms**

239. Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

240. Beginning in 2017 or earlier, and continuing through the present, CoStar imposed uniform, non-negotiable Customer Terms on brokers and other customers as a condition of access to the LoopNet and CoStar platforms. Those terms apply across CoStar's customer base and work together to restrain customers' ability to provide CRE information to CoStar and LoopNet competitors.

241. The terms operate as exclusive dealing agreements because they restrain customers' ability to provide CRE information to CoStar competitors that they also provide to CoStar. CoStar enforces these restraints through contractual penalties, threats to customers, and various technological measures.

242. These exclusive dealing agreements affect a substantial amount of interstate commerce, unreasonably restrain trade, and substantially foreclose competition in the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market. Access to customer-submitted CRE information is essential to an Internet CRE listing or information platform's ability to compete. In markets characterized by strong network effects, high data-collection costs, and other substantial barriers to entry, foreclosing rivals from access to large amounts of CRE information increased those barriers to entry.

70

243.    The natural and intended effect of these agreements was to weaken current and future competitors, preserve CoStar's market power, increase prices, and insulate CoStar from competition on the merits. These agreements also contravened the FTC's stated goal of ensuring that CoStar does not directly or indirectly restrain customers' ability to provide CRE information to competitors.

244.    CoStar cannot show any cognizable procompetitive benefits that outweigh the harm to competition and consumers. Any legitimate interest CoStar may have had in formatting, displaying, or preserving customer-submitted content, or to protect its intellectual property, could have been achieved through means far less restrictive than restraining customers' ability to share their own CRE information with competitors.

245.    As a direct and proximate result of these exclusive dealing agreements, Plaintiff and members of the Class have suffered injury to their business and property. That injury includes paying higher prices for Internet CRE listing and information services than they would have paid absent CoStar's exclusive dealing agreements, receiving those services in markets with diminished competition and reduced innovation, and facing reduced choice among providers of Internet CRE listing and information services. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent.

246.    Plaintiff and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

247.    Plaintiff and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

## COUNT FOUR

### Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

### Unlawful Monopolization of the Internet CRE Listing and Information Services Markets

248.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

249.    The relevant markets are the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market. CoStar possesses market power in both markets. CoStar controls approximately 80% of both markets, has the power to control prices and exclude competition in both markets, and has repeatedly imposed supracompetitive price increases without losing sufficient business to render those increases unprofitable.

250.    CoStar has willfully acquired, maintained, and entrenched its monopoly power in the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market through the anticompetitive scheme alleged herein. That scheme includes, among other things, (i) coercing the three largest national CRE brokerages into agreements not to compete in the Internet CRE listing or information services markets; (ii) coercing the three largest national CRE brokerages into agreements not to share and/or to limit the sharing of their own CRE information with CoStar competitors; (iii) imposing uniform Customer Terms across all customers that restrain their ability to share their own CRE information with CoStar competitors; and (iv) enforcing the Customer Terms' restraints through watermarking, IP blocks, website scraping, image filters, threats to customers, and contractual penalties. The foregoing aspects of the scheme work together and must be viewed as a whole.

251.    CoStar's scheme is exclusionary and anticompetitive. Access to customer-submitted CRE information is essential to an Internet CRE listing or information platform's ability to compete. In markets characterized by strong network effects, high data-collection costs,

and other substantial barriers to entry, foreclosing rivals from access to large amounts of CRE information increased those barriers to entry.

252. The natural and intended effect of CoStar's scheme is to weaken current and future competitors, preserve CoStar's market power, increase prices, and insulate CoStar from competition on the merits. These agreements also contravened the FTC's stated goal of ensuring that CoStar does not directly or indirectly restrain customers' ability to provide CRE information to competitors.

253. CoStar's monopoly power in these markets is not the result of a superior product, business acumen, or historic accident. Rather, it is the product of exclusionary conduct designed to suppress competition, deny rivals access to essential customer-supplied inputs, and prevent customers from turning to meaningful alternatives. CoStar executives and employees have acknowledged the competitive threat posed by other Internet CRE listing and information services platforms, that customers feel locked into CoStar and LoopNet, and customers' desire for alternatives to the CoStar and LoopNet platforms.

254. CoStar cannot show any cognizable procompetitive benefits that outweigh the harm caused by its anticompetitive scheme. Any legitimate interest CoStar may have had in protecting and preserving customer-submitted content or protecting its intellectual property could have been achieved through means far less restrictive than a scheme to lock up customer-submitted CRE information, restrain customers from working with competitors, and weaken rivals.

255. CoStar's anticompetitive scheme has had substantial effects on interstate commerce. CoStar provides nationwide Internet CRE listing and information services to

customers throughout the United States and competes for customer-owned data on a nationwide basis.

256.    As a direct and proximate result of CoStar's scheme, Plaintiff and members of the Class have suffered injury to their business and property. That injury includes paying higher prices for Internet CRE listing and information services than they would have paid absent CoStar's scheme, receiving those services in markets with diminished competition and reduced innovation, and facing reduced choice among providers of Internet CRE listing and information services. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent.

257.    Plaintiff and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

258.    Plaintiff and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

**<u>COUNT FIVE</u>**

**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**

**Attempted Monopolization of the Internet CRE Listing and Information Services Markets**

259.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

260.    This Count is alleged in the alternative to Count Four.

261.    The relevant markets are the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market.

262.    Through the anticompetitive scheme alleged herein, CoStar has willfully attempted, and continues to attempt, to monopolize the nationwide Internet CRE listing services

market and the nationwide Internet CRE information services market. CoStar specifically intended to monopolize those markets and to destroy or materially weaken competition within them. That specific intent is reflected in, among other things, CoStar's course of conduct and in CoStar executives' expressed acknowledgements that customers were desperate for alternatives to CoStar and LoopNet, that rivals such as CREXI posed a competitive threat, and that CoStar sought to destroy its competition rather than compete on the merits.

263.    CoStar's anticompetitive scheme includes, among other things, (i) coercing the three largest national CRE brokerages into agreements not to compete in the Internet CRE listing or information services markets; (ii) coercing the three largest national CRE brokerages into agreements not to share and/or to limit the sharing of their own CRE information with CoStar competitors; (iii) imposing uniform Customer Terms across all customers that restrain their ability to share their own CRE information with CoStar competitors; and (iv) enforcing the Customer Terms' restraints through watermarking, IP blocks, website scraping, image filters, threats to customers, and contractual penalties. The foregoing aspects of the scheme work together and must be viewed as a whole.

264.    CoStar's attempted monopolization has a dangerous probability of success. CoStar already dominates both the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market, possesses the power to control prices and exclude competition, and operates in markets characterized by strong network effects, high switching costs, high data-collection costs, and other substantial barriers to entry and expansion. Access to customer-submitted CRE information is critical to competition in both markets, and an Internet CRE listing or information services platform cannot compete effectively without access to that information. By restraining customers' ability to share their own CRE information with

75

CoStar competitors, CoStar has created and maintained a dangerous probability that its attempt to monopolize will succeed.

265. CoStar's attempt to monopolize these markets is not the result of a superior product, business acumen, or historic accident. Rather, it is the product of exclusionary and anticompetitive conduct designed to suppress competition, deny rivals access to essential customer-supplied inputs, raise rivals' costs, and prevent customers from turning to meaningful alternatives.

266. CoStar cannot show any cognizable procompetitive benefits that outweigh the harm caused by its anticompetitive scheme. Any legitimate interest CoStar may have had in protecting and preserving customer content or protecting its intellectual property could have been achieved through means far less restrictive than a coordinated course of conduct designed to lock up customer CRE information, restrain customers' ability to work with competitors, and weaken rivals. The intended function and effect of CoStar's scheme is to secure monopoly power and to maintain supracompetitive prices in both relevant markets.

267. CoStar's anticompetitive scheme has had substantial effects on interstate commerce. CoStar provides nationwide Internet CRE listing and information services to customers throughout the United States and competes for customer-owned data on a nationwide basis.

268. As a direct and proximate result of CoStar's scheme, Plaintiff and members of the Class have suffered injury to their business and property. That injury includes paying higher prices for Internet CRE listing and information services than they would have paid absent CoStar's scheme, receiving those services in markets with diminished competition and reduced innovation, and facing reduced choice among providers of Internet CRE listing and information

76

services. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent.

269. Plaintiff and the Class are entitled to treble damages, interest, reasonable attorneys' fees, and costs under Section 4 of the Clayton Act.

270. Plaintiff and the Class are further entitled to permanent injunctive relief under Section 16 of the Clayton Act to terminate the unlawful conduct alleged herein and to prevent its recurrence.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks this Court for the following:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and its counsel of record as Lead Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. Adjudge and decree that Defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, as alleged herein;

C. Permanently enjoin Defendants, their subsidiaries, affiliates, successors, transferees, assignees, officers, directors, agents, and employees, and all other persons acting or claiming to act on their behalf, from continuing, maintaining, renewing, or enforcing the unlawful conduct alleged herein, and order Defendants to take all steps necessary to terminate the anticompetitive scheme alleged herein and restore competition in the nationwide Internet CRE

listing services market and the nationwide Internet CRE information services market;

D.  Permanently enjoin Permanently enjoin Defendants, their subsidiaries, affiliates, successors, transferees, assignees, officers, directors, agents, and employees, and all other persons acting or claiming to act on their behalf, from retaliating in any way against Plaintiff or any member of the Class for participating in this action.

E.  Award Plaintiff and the Class all damages sustained by reason of Defendants' unlawful conduct, trebled as provided by law pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, together with pre-judgment and post-judgment interest;

F.  Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

G.  Award such equitable relief as the Court deems appropriate to remedy the ongoing anticompetitive effects of Defendant's conduct and to prevent recurrence of the violations alleged herein; and

H.  Award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff and members of the Class demand a trial by jury on all claims so triable under Federal Rule of Civil Procedure 38(b).

Dated: April 14, 2026                    Respectfully submitted,

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
**WEBSTER BOOK LLP**
2300 Wilson Blvd., Suite 728

78

Arlington, VA 22201
(888) 987-9991 (telephone and fax)
swebster@websterbook.com

Gregory S. Asciolla (*pro hac vice anticipated*)
Steven L. Groopman (*pro hac vice anticipated*)
Geralyn J. Trujillo (*pro hac vice anticipated*)
Corey Lipton (*pro hac vice anticipated*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
(646) 933-1000
gasciolla@dicellolevitt.com
sgroopman@dicellolevitt.com
gtrujillo@dicellolevitt.com
clipton@dicellolevitt.com

Joseph M. Vanek (*pro hac vice anticipated*)
Eamon P. Kelly (*pro hac vice anticipated*)
Michael G. Dickler (*pro hac vice anticipated*)
**SPERLING KENNY NACHWALTER, LLC**
321 N. Clark St., 25th Floor
Chicago, IL 60654
Tel: (312) 641-3200
jvanek@sperlingkenny.com
ekelly@sperlingkenny.com
mdickler@sperlingkenny.com

*Counsel for Plaintiff Shapiro Hospitalities LLC d/b/a
Grand & Co. and the proposed Class*